UNION ELECTRIC COMPANY, a Missouri Corporation, Respondent,

v.

Charles JONES and Esther Jones, his wife, Appellants.

No. 49093.

Supreme Court of Missouri,

Division No. 2.

April 9, 1962.

Motion for Rehearing or for Transfer to Court en Banc Denied and Opinion Modified May 14, 1962.

Robert B. Baker, Ellington, for appellants.

J. B. Schnapp of Schnapp & Cooper, Fredericktown, J. Ben Searcy, Eminence, for respondent.

STOCKARD, Commissioner.

This appeal arises out of proceedings brought by Union Electric Company to obtain title to certain land by condemnation to construct electric generating facilities.

Union Electric is a public utility authorized to engage in the manufacture and transmission of electric current for light, heat and power, and for the sale thereof to the public. It obtained the approval of the Missouri Public Service Commission to build, operate and maintain in Reynolds County, Missouri, additional electric generating facilities comprising "a high head pumped storage electric generating station, consisting of five major components, to-wit: a dam, a lower pool, an upper pool, a water way, and a pumping and generating stations, together with necessary transmission lines leading therefrom." Union Electric proposes to construct the dam across the East Fork of Black River which appellants assert, and Union Electric does not deny, is a nonnavigable stream. This dam will form the lower pool which will have an area of approximately 370 acres, and a substantial portion of the 240 acre tract of appellants' land which Union Electric seeks to condemn will be flooded thereby. The upper pool with an area of about 50 acres will be constructed about a mile away on top of Proffit Mountain at a substantially higher level than the lower pool. A tunnel 6,300 feet in length will lead from the upper pool to a power plant adjacent to the East Fork of Black River, but which is not located at or near to the dam forming the lower pool. When the project is completed electric energy from steam generating facilities in St. Louis will be used during periods when the use of electricty is at a minimum to pump water from the lower pool to the upper pool.

When peak loads occur the water will be permitted to flow through the tunnel from the upper pool to the lower pool and generate electric power at the power plant. The entire project will be operated electronically by controls in St. Louis.

■ Appellants first contend on this appeal that Union Electric does not possess the power or authority to condemn their land, or any part of it, pursuant to Chapter 236 (all statutory references are to RSMo 1959, V.A.M.S., unless otherwise stated) and that the limited power of eminent domain therein granted is exclusive to what they contend is a general power of eminent domain contained in Chapter 523. Both Chapters grant the power of eminent domain in certain factual situations, and each Chapter as now written sets forth the procedure to exercise that power. However, Civil Rule 86, V.A.M.R., now governs the *procedure* to be followed in the exercise of the power of eminent domain granted by either Chapter. See Civil Rule 86.01, V.A.M.R.

■ What is now Chapter 236, commonly referred to as the mill dam act, was first enacted in 1822, see Vol. I, Territorial Laws of Missouri, p. 948, but it then pertained to the construction of a dam and of water, grist, and saw mills on a watercourse. By 1835 the application of the act had been limited to a "water course not being a navigable stream." R.S.1835, p. 406, § 1. In 1905, Laws 1905, p. 232, apparently as the result of the ruling in Southwest Missouri Light Co. v. Scheurich, 174 Mo. 235, 73 S.W. 496, the act was amended to extend the authority to construct a dam across a nonnavigable stream to "any * * corporation chartered and organized to construct, operate and maintain mills, electric power and light works, or other machinery." We are not concerned in these proceedings with whether Union Electric has complied with the mill dam act, if applicable, and obtained authority to construct the dam. We are concerned only with the grant therein of the power of eminent domain. Section 236.010 provides that certain persons and corporations "may erect a dam" across a nonnavigable stream "if such person or corporation is the proprietor of the land through which the watercourse runs at the point where it is proposed to erect such dam, by proceeding as herein provided." It appears from the testimony that at the time these condemnation proceedings were commenced Union Electric owned the land on both sides of the watercourse at the site of the dam. Provision is made to determine the "damages each proprietor will sustain by reason of inundation consequent upon the erection of the dam." Whether the person or corporation building the dam is to obtain title to the land inundated or only flooding rights thereover is not clear, but the inference is that title is not to be obtained. There is no authority to obtain any interest in land not inundated, even for generating facilities, except that when the land on only one side of the stream is owned, a maximum of one acre may be obtained on the other side to abut the dam. Provision is made that the jury selected to determine the damages should determine whether "the mansion house of any such proprietor, or the outhouses, curtileges or gardens thereto immediately belonging, or orchard, will be overflowed" and whether and to what extent "ordinary navigation" (on a nonnavigable stream?) and the passage of fish will be obstructed, as well as other things. It is further provided that if no objections be filed to the proceedings, and it shall appear to the court that the mansion house of any proprietor, or the outhouse, curtilages or gardens thereto belonging, or orchard will not be overflowed, and that the health of the neighborhood will not be materially affected by the stagnation of water, the court shall thereupon grant or refuse the permission prayed for to build the dam according to its judgment of what would be most reasonable and just under all circumstances.

We shall now look to Chapter 523. It apparently represents a consolidation of various grants of the power of eminent domain to companies organized for various

purposes. See Laws of Missouri 1851, p. 259 § 8, pertaining to plank roads and macadamized roads; Laws of Missouri 1853, p. 128, §§ 13 and 14, pertaining to railroads; Laws of Missouri 1866, p. 47, pertaining to land taken for telegraph, road and railroad purposes; and Laws of Missouri 1919, p. 207 pertaining to oil, pipeline or gas corporations. In 1915 the power of eminent domain was granted to "any electrical corporation organized for the manufacture or transmission of electric current for light, heat or power." Laws of Missouri 1915, p. 227. Insofar as applicable to the grant of the power of eminent domain to electric companies, Section 523.-010 now provides: "In case land, or other property is sought to be appropriated by * * * any electrical corporation organized for the manufacture or transmission of electric current for light, heat or power, including the construction (when that is the case) of necessary dams and appurtenant canals, flumes, tunnels and tailraces and including the erection (when that is the case) of necessary electric steam power-houses, hydroelectric powerhouses and electric substations * * *," and the corporation and the owners cannot agree upon the proper compensation, then certain procedure is to be followed, which, however, is now subject to Civil Rule 86, V.A.M.R.

It is thus apparent that there are two statutes relating to the power of eminent domain of electric companies. These provisions must be read in pari materia and, if possible, effect given to each clause and provision. Davenport v. Teeters, Mo.App., 273 S.W.2d 506, 510. In such situation "where one statute deals with a subject in general and comprehensive terms and another deals with the same subject in a more minute and definite way, the two should be read together and harmonized if possible, and with a view to giving effect to a consistent legislative policy, but that to the extent of any repugnancy between them the definite prevails over the general, * * *." We must, if possible, reconcile any apparent conflict in these two statutes with the general legislative purpose. Layson v. Jackson County, 365 Mo. 905, 290 S.W.2d 109; Veal v. City of St. Louis, 365 Mo. 836, 289 S.W.2d 7. Chapter 236 relates to the construction of a dam on a nonnavigable stream, and by reason of the time of its enactment it is apparent that it was intended to have reference to the then typical or usual situation where small and locally used generating equipment was to be a part of or operated in conjunction with a dam. The power of eminent domain granted is limited to a precise factual situation which does not include this case. Subsequent to the time the mill dam act was made applicable in its limited respects to electric companies, the regulation of such companies constituting public utilities, of which Union Electric is one, was vested in the Missouri Public Service Commission, including the construction and operation of generating facilities. See Laws of Missouri 1913, p. 556, and Chapter 393 RSMo 1959, V.A.M.S. Following this the Legislature enacted in 1915 what we consider not to be a general act, as that term is normally used, but a specific grant of the power of eminent domain to "any electrical corporation organized for the manufacture or transmission of electric current for light, heat or power" to obtain the necessary land, including title thereto when needed, for the construction of dams, canals, flumes, tunnels, tailraces, hydroelectric powerhouses and electric substations. This specific grant, while in one sense is general, is in another respect specific, and it precisely covers the factual situation here. It evidences a clear and unambiguous intent on the part of the Legislature that in the construction of the facilities enumerated in Chapter 523, "any electrical corporation" should have the power of eminent domain therein specifically granted. We see no actual conflict between the grants of power in the two Chapters. Insofar as Chapter 236 goes, there is no conflict; it just does not go as far as Chapter 523, and there is absolutely nothing to indicate that when the provisions of Chapter 523 were made applicable to electric companies, the Legislature in-

tended to carve out of that specific grant of the power of eminent domain an exception constituting the limited grant of power in Chapter 236. The contentions of appellants that Union Electric does not have the *power* of eminent domain in the present factual situation is without merit.

Appellants next contend that Union Electric's "petition showed on its face that land was being taken for unauthorized purposes, to wit: land taken for 'security purposes,' and land taken for 'necessary protection.' " The petition alleged that it was necessary that Union Electric acquire all of appellants' land "for impounding water thereon, flooding the said real estate, and the protection of the highhead pumped storage electric generating stations, including all the major components thereof, and the necessary security measures therefor." The evidence shows that the lower pool forms a lake roughly in the shape of a "V", and that appellants' land lies inside the "V" at the middle, and that approximately one half of it will actually be flooded. Appellants' land is near the center of the entire project and lies directly between the upper and lower pools. It is completely surrounded by land previously acquired by Union Electric for the project. Over that portion of appellants' land not actually flooded there will be constructed a 345 KV transmission line, and a communication or control cable carrying 16 to 20 circuits which will be used in the remote control operation of the facilities.

Appellants assert in their brief that they do not contend that any land is being taken in excess of that necessary for the authorized public purposes, but that this "is a case where land is taken for purposes not included in the statutes" because there is no power to condemn for "protection" of the authorized installations or for the "necessary security measures."

█ The protection and security of a 50-million dollar remote controlled generating facility is just as much an essential part of the overall project as any other feature thereof. The project admittedly is for a public use, and the power of eminent domain extends to the acquisition of the necessary land for each and every essential part of the project. The power to locate the project and to determine the extent of land necessary for economical and proper construction is vested by legislative act in the sound discretion of Union Electric uncontrolled by the courts except as to the issues of fraud, bad faith, or an arbitrary and unwarranted abuse of discretion; issues which are not in this case. State ex rel. State Highway Commission v. Curtis, 359 Mo. 402, 222 S.W.2d 64; 29 C.J.S. Eminent Domain § 89. Union Electric's evidence established that all the land of appellants was reasonably necessary for the construction and the proper operation. and maintenance of the project.

Appellants next assert that the trial court erred in "sustaining the objection to the admission of evidence of mining, mineral exploration and development * * * within the area in which [their] lands were located * * *." Mr. Charles Jones was asked whether in 1952 when he purchased the land sought to be condemned "there was any evidence of old mining activities near that property." An objection was sustained and an offer of proof was made that "there was at that time old lead mining shafts [50 years old or older] about a quarter of a mile southeast of this property and that there was old iron mining activity [12 or 15 years old] about a mile southwest of this property, and at that time there was no evidence of any mining activity or drilling or prospecting." Subsequently, the court rejected a second offer of proof that "there was on the date of the taking the business of extensive drilling and exploration for minerals, principally lead, that this business was a growing influence on values, that there was located or is located on the date of the taking a brand new town of Viburnum only about 20 to 25 miles northwest of the property, that there is serving this town a new railroad spur or track leading from the main rail lines to

this town. The principal business activity of this town at this time is the construction of mine shafts preparatory to the development of a large lead mine."

Where the entire tract is being taken, as in this case, the just compensation is measured by the reasonable market value of the land in its condition on the day of the appropriation. State ex rel. State Highway Commission v. Howald, Mo., 315 S.W.2d 786; State ex rel. State Highway Commission v. Schutte Investment Company, Mo., 334 S.W.2d 241. When the land contains minerals, the measure of compensation is the value of the land with the minerals in it. 29 C.J.S. Eminent Domain § 174. Here, appellants did not offer evidence that there were minerals in the land to be taken, but instead by their first offer of proof sought to show that in the neighborhood, but not the close neighborhood, there were some long abandoned shafts for lead and iron mines. There was no offer to show that lead or iron was ever obtained therefrom, or why they were abandoned. For aught that appears in the offer of proof, they were abandoned because no minerals were found. In the second offer of proof appellants sought to show that there were existing mining operations 20 to 25 miles away. This evidence apparently was offered on the theory that the jury could infer therefrom that there were minerals on the land of appellants, and that mining was one of the uses to which the land was adapted. However, it would be pure speculation and conjecture that minerals were on appellants' land by reason of the offered evidence. If minerals were there proper proof thereof would have been readily available. The offer of proof was properly refused. See Union Electric Company of Missouri v. McNulty, Mo., 344 S.W.2d 37, 40; In re Armory Site in Kansas City, Mo., 282 S.W.2d 464; Chicago B. & Q. Rd. Co. v. City of Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979; 29 C.J.S. Eminent Domain § 160, p. 1026.

Appellants next assert that the trial court erred in excluding the testimony of James Sutterfield as to the price he received for his farm about seven months prior to the condemnation of appellants' land. Sutterfield testified out of the presence of the jury that his farm was located about 20 miles from appellants' land and that he sold it to the American Metal Smelting Company "for mining purposes." Evidence of the sale price of property similar to that involved generally is admissible to aid the triers of fact in determining the compensation to which the owner is entitled for the taking of his property. The admissibility of such evidence depends upon the nearness of the sale in point of time and the proximity of the property, of the similarity in location, and in the use to which the property is adaptable. In re Armory Site in Kansas City, supra. Here, there was no showing that appellants' land was adaptable for mining, yet the Sutterfield land was sold for mining purposes. It is incumbent on the party offering evidence of the sale of other land to show by offer of proof, or otherwise, that it is admissible. Here, appellants' offer of proof showed it was inadmissible. There was no error in rejecting it.

The date of the hearing on the petition was set for November 28, 1960, at the Reynolds County Courthouse at Centerville, Missouri. Appellants employed as their counsel Mr. J. Glennon McKenna of St. Louis. On November 22, counsel for Union Electric called Mr. McKenna and asked if he would be ready to proceed with the case on November 28, and he replied that either he or Mr. William H. Bruce, Jr., an attorney at Ellington, Missouri, would be there. On November 28, Mr. McKenna did not appear, but appellants and Mr. Bruce were present at the appointed time. No pleadings were filed. Mr. Bruce made an oral request for a continuance to which Union Electric did not consent, and after a conference with appellants he declined to file a written request for a continuance. The trial court directed the hearing to proceed. Mr. Bruce participated in that hearing, cross-examined Union Electric's wit-

nesses and presented testimony on behalf of appellants.

■ Appellants now contend that the trial court abused its discretion in arbitrarily proceeding with the hearing on the petition without the presence of their attorney who was absent through no fault of theirs. This contention is without merit. Civil Rule 65.03, V.A.M.R., provides that every application for a continuance shall, unless the adverse party consent that it be made orally in open court, be made by motion in writing, accompanied by the affidavit of the applicant, or of some other credible person, setting forth the facts on which the application is founded. Appellants declined for reasons of their own to make this application after consultation with Mr. Bruce who was then acting as their attorney. See Savings Finance Corporation v. Blair, Mo.App., 280 S.W.2d 675. After appellants obtained their present counsel and Mr. McKenna and Mr. Bruce withdrew as counsel, appellants filed a motion to set aside the hearing on the petition on the ground now asserted. In the hearing on that motion appellants called Mr. Bruce as a witness, and he testified unequivocally that he was acting as counsel for appellants with their knowledge and consent. The facts and circumstances reveal that this unquestionably was true. It has not been the practice in this state that litigants can subsequently disagree with the strategy employed by their counsel, employ new and different counsel, and then start all over again in their litigation. The trial court did not err in proceeding with the hearing on the petition.

At the time Mr. Bruce withdrew as counsel he filed a motion requesting that a fee for services rendered be allowed as a lien on the award received by appellants. The court did allow such a lien in a modest amount. Appellants now assert that the court erred in doing so without a hearing, and because the motion shows on its face that Mr. Bruce was employed by Mr. McKenna, and if he is entitled to a fee he must look to him.

■ First, as to the hearing. Appellants made no request for a hearing, and the motion was pending at the time of the hearing on appellants' motion to set aside the proceedings which was filed after the commissioners made their report and before the jury trial on the issue of damages. At that hearing Mr. Bruce and appellants testified concerning the arrangements for his employment and the services he rendered. In addition, the transcript of the testimony at the hearing was introduced in evidence. Appellants now point out not one item of evidence on the issue raised by Mr. Bruce's motion which they claim they were unable to present to the court. Second, as to the allegations of the motion. We think that the motion did allege that Mr. Bruce was employed to act for appellants, and the evidence, in our opinion, conclusively shows he rendered legal service to appellants at their request. In that event, a promise to pay the reasonable value of the services is implied in the absence of an express contract. McCleary v. Bratton, Mo.App., 307 S.W.2d 722. The principal argument of appellants is that "if [Mr. Bruce] is entitled to a lien for attorney's fee, he must be employed by the principal attorney with the knowledge and consent of the clients." The evidence establishes that he was so employed.

The judgment is affirmed.

BOHLING and BARRETT, CC., concur.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.

On Motion.

Appellants point out that in the comparison of the provisions of Chapter 236 and Chapter 523 we incorrectly stated that Section 236.160 provides that if the circuit court found that the mansion house and other named properties "are to be flooded"

it was authorized to take certain action, whereas in fact Section 236.160 uses the words "will not be overflowed." The opinion as originally handed down is modified and that portion thereof has been reworded to recite correctly the provisions of Section 236.160. However, appellants' contention that because of this we erred in concluding that Chapter 523 was applicable is without merit.

■ Appellants next assert that we erred in stating that the evidence of abandoned mines and of mining activity was offered on the theory that the jury could infer therefrom that there were minerals on their land. They contend that the evidence was offered for a different purpose, and that "mining activity, drilling and prospecting, in an area, are simply business activities affecting the demand for real estate, (principally underground rights) and any increase in the demand would be a fact from which the jury might infer a market value on the day of the taking." They argue that "regardless of whether there are any minerals under the particular land, they [the above activities] increase the market value of the mineral interest." Appellants admit that "The market value is, of course in this case, based upon pure speculation." They then assert that this speculative market value "is a definite and positive fact and can be determined with reasonable certainty on any day even though based upon speculation." We do not agree with this last assertion.

The case upon which appellants principally rely, Union Electric Company of Missouri v. McNulty, Mo., 344 S.W.2d 37, states that " 'In determining the uses of which the property is capable, it is necessary to have regard to the existing business or wants of the community or such as may reasonably be expected in the immediate future. This * * * means only that the fact of the property's capability or adaptability to the use may be considered as an element of its present value. *Mere speculative uses cannot be considered.*' "

(Italics added). Assuming that the evidence was offered for the asserted purpose, it was properly excluded.

The opinion is modified as above stated, and appellants' motion for rehearing or to transfer to the court en banc is overruled.