232 So.2d 46 (1970)
SEADADE INDUSTRIES, INC., a Florida Corporation, Petitioner,
v.
FLORIDA POWER & LIGHT CO., a Florida Corporation, Respondent.
No. 69-952.
District Court of Appeal of Florida, Third District.
February 18, 1970.
Rehearing Denied March 12, 1970.
*47 Helliwell, Melrose & Dewolf, Miami, for petitioner.
*48 Scott, McCarthy, Steel, Hector & Davis and James H. Sweeny, III, Miami, for respondent.
Before PEARSON, C.J., and HENDRY and SWANN, JJ.
SWANN, Judge.
Seadade Industries, Inc. seeks a writ of certiorari to review an order authorizing the taking of some of its real property by Florida Power & Light Company which was entered in the trial court. See Clark v. Gulf Power Co., Fla.App. 1967, 198 So.2d 368; Couse v. Canal Authority, Fla. App. 1967, 194 So.2d 301; and Camp Phosphate Co. v. Marion County, Fla.App. 1967, 194 So.2d 302.
Florida Power & Light Company filed a petition seeking to condemn certain real property owned by Seadade, together with a Declaration of Taking. Fla. Stat. § 74.031, F.S.A.
It sought fee simple title to a strip of real property, owned by Seadade, approximately 4 1/2 miles long and 660 feet wide, to be used partially as a canal for a circulating and cooling water system in connection with its generating plant at Turkey Point, Florida. The strip of land runs in a southerly direction from Turkey Point through Seadade's land and into Card Sound.
Seadade answered, moved to dismiss the petition and quash the Declaration of Taking. Testimony and evidence was taken and the trial court entered an Order of Taking which provided that upon deposit of $634,000 in the registry of the court, the real property should vest in the power company. Fla. Stat. § 74-051, F.S.A. The Petition for Writ of Certiorari is to that Order of Taking.
Seadade claims that there were several departures from the essential requirements of law in the entry of the Order of Taking.
It concedes that the power company has the power and authority to condemn land for a proper purpose. § 361.01, Fla. Stat., F.S.A., and Demeter Land Co. v. Florida Public Service Co., 99 Fla. 954, 128 So. 402 (1930). It argues that the power company failed to show any necessity or valid public purpose for this entire taking.
The record shows a resolution of the Board of Directors of the power company was received in evidence below. It was to the general effect that the acquisition of this real property for a canal and other purposes was an essential element for use in connection with a circulating and cooling water system for its power generating plant at Turkey Point. Cf. Catholic Burse Endowment Fund v. State Road Department, Fla.App. 1965, 180 So.2d 513; and State Road Department of Florida v. Southland, Inc., Fla.App. 1960, 117 So.2d 512.
Generally, when a determination has been made by a condemning authority as to the necessity of taking for a public purpose, it will not be overthrown or set aside by the courts in the absence of fraud, bad faith, or gross abuse of discretion. This rule applies to the route, or line, or location of the proposed work or improvement; Wilton v. St. Johns County, 98 Fla. 26, 123 So. 527, 65 A.L.R. 488 (1929); 12 Fla.Jur. Eminent Domain, §§ 59-61, and the quantum of proof to overthrow or set aside such a finding must be of the most conclusive character. See Rott v. City of Miami Beach, Fla. 1957, 94 So.2d 168.
Seadade does not specifically claim or seek to overthrow the Order of Taking because of any fraud or bad faith on the part of the power company. It says that the company has not proven necessity, or has grossly abused its discretion in exercising its delegated powers of condemnation.
We will not burden this opinion by reciting the testimony and evidence presented by the power company in order to show the necessity of this real property and canal for use in connection with the generation of sufficient electric power to meet the current and future needs of the rapidly expanding population of South Florida. All *49 power generating plants must have some type of cooling systems. Many use canals for this purpose and the generating plant presently in operation at Turkey Point uses a canal cooling and circulating system. When the nuclear power units presently under construction at Turkey Point go into operation it will be necessary to have a cooling and circulating system adequate for their increased needs and purpose. The company spent considerable time, effort and money to determine whether the cooling and circulating system to be used in connection with the nuclear power units at its Turkey Point operation should consist of open or closed cooling towers, cooling lakes, spray ponds, deep wells or ocean outfalls.
It finaly determined that the best cooling and circulating system based on all factors, including economy, efficiency, and engineering requirements was the system proposed via the canal as set forth in its resolution.
It is proper to take the economic factor into consideration in arriving at such a determination. Catholic Burse Endowment Fund v. State Road Department, supra.
We find no departure from the essential requirements of the law in the determination that a sufficient showing was made to establish the necessity for a canal for use as a circulating and cooling system in connection with the power generating plants at Turkey Point.
Seadade argues also that under the question of "necessity" we must consider the effect of the discharge of large quantities of heated water via this proposed canal into Card Sound and its probable effect on the ecology and environment in that area.
The question of what probable effect the discharge of heated water via the proposed canal into Card Sound will have on the ecology and environment of the area is a serious one as are all questions of possible pollution of our environment. Scientists and experts apparently disagree as to the setting of proper or standard temperatures for their waters. A recent article revealed that the State of Kentucky set its water temperature standards a 93°; Fahrenheit; Indiana at 90°; Ohio at 93°; West Virginia at 86°; and Pennsylvania at 86° .[1] We are advised that the Dade County Pollution Control Board has set the temperature standards for discharge of heated water into Card Sound via this canal at 95° Fahrenheit.
We do not see a present issue in this case as to whether the discharge of the heated water via this canal in the future will subsequently amount to a taking of property in the Card Sound area. The power company admits that it will have to obtain approval of U.S. Army Corps of Engineers and the Internal Improvement Fund of Florida for the dredging and cutting of the canal into Card Sound. It will also be necessary for the power company to obtain approval of the Dade County Pollution Control Board, and it may be necessary to obtain permission, approval, or concurrence of other state, county or federal agencies prior to the final discharge of any water via this canal into Card Sound.
We do not find any gross abuse of discretion by the power company or the trial court in the determination to permit a discharge of heated water into Card Sound. A number of power generating plants are doing this at the present time. If, in the future, the power company discharges water which is heated to such a degree as to cause sufficient environmental or ecological problems, or to violate proper rules, regulations or ordinances set by proper authorities, we will consider and pass on that issue at that time. We specifically refrain from ruling on it now.
Seadade next argues that the power company does not need or require fee simple title to 660 feet of approximately 4 1/2 miles *50 of its land and that the taking of such an excessive amount is a gross abuse of discretion of delegated authority. The record shows that the proposed canal will be 20 feet deep and 188 feet wide at the surface; that 20 foot roads on either side of the canal are to be provided; that the muck material to be excavated will occupy an area 41 feet on each side; the rock spoil or dredge  excavated material will occupy 170 feet on each side and a buffer zone of about 5 feet on each side is claimed to be necessary by the power company to insure that the spoil material or construction operations do not encroach upon the adjacent property.
It appears that there is substantial competent evidence in the record on appeal to justify the necessity of taking fee simple title to the land necessary for the construction and maintenance of the canal, roads and buffer zones.
A different question arises as to the sufficiency of the proof of necessity for acquisition of fee simple title to the real property sought for storage purposes for the muck and rock material excavated in the digging of this land for the canal. In other words, the power company wants to acquire fee simple title to a strip of Seadade's land which is approximately 4 1/2 miles long and 422 feet in width in order to permanently deposit and store thereon the rock and muck excavated for the canal. While a cooling and circulating system by means of a canal for water heated in order to generate electricity may be a public purpose it does not appear that any public purpose is served by permitting the power company to condemn fee simple title to private land for the purpose of storing its rock or muck excavated materials permanently thereon.
It is undisputed that the major portion of Seadade's land is low and consists primarily of muck and mangrove swamp and that it will require large amounts of fill before it can be developed. The testimony reveals that the fill herein would amount to several million yards and that it may be worth .25¢ a cubic yard. To require Seadade to convey fee simple title to land for a canal out of which the power company would excavate tons of fill and to require it to also provide fee simple title to land on which the power company could store this material permanently appears to us to be unjust and unnecessary. The record reflects that Seadade has had engineering and feasibility reports conducted concerning the development of this property and that it plans to develop this property as soon as reasonably possible. Pertinent parts of the testimony of the power company concerning this land and fill are:
"Q. Do you propose to just leave the fill there? Is that the idea?
A. The fill may have to remain there.
Q. Why?
A. Because it may not otherwise be able to be disposed of.
Q. Why not?
A. Well, it may be that we could not find a suitable purchaser for it or other suitable means of disposal.
Q. In other words, just about 200 feet of width, about which you are referring, is to deposit this fill; is that right?
A. It will be required.
Q. How high a deposit would this make?
A. I think we are estimating about twenty some-odd feet at the present time. Twenty-three, I believe.
Q. Twenty-three feet high. How wide at the base?
A. About a hundred feet at the base. Can I refresh my recollection?
Q. Yes.
A. I think I gave the figures in previous testimony. They are in the records some place.

*51 * * * * * *
THE WITNESS: We plan on forty-one feet on each side for the muck spoil, and a hundred and seventy feet on each side for the rock material.
Q. A hundred and seventy feet on each side. That fill has some value, does it not?
A. Value?
Q. Yes.
A. It has value if there is a buyer for it.
Q. Do you propose to leave it there perpetually?
A. Well, we hope to be able to dispose of it at some time, but, at the present time we certainly have no assurance that we could find a buyer for it.
Q. Have you made any effort to determine whether it has a value in the market?
A. Well, we know generally that when we needed fill material for our Turkey Point plant we certainly know the value of the fill material to us at that time.
On the other hand, we had a very definite need for fill and for a large amount of fill at that time. But, if there is no other buyer that needs large amounts of fill in the area, it would have no value at all.
Q. What would have been the value to you of such fill when you were building the Turkey Point plant?
A. Well, we purchased fill, for example, from the Central and south Florida District at twenty-five cents a cubic yard.
Q. Using that figure  and you must have made a calculation on this  what would you consider the value of that fill if you had a buyer who needed it?
A. Well, it would be something like  I think there would be two or three million dollars worth of fill there at that twenty-five cent figure.
Q. Just from the canal; is that right?
A. Right. If we had a buyer.
The value is entirely dependent upon whether we can get somebody to buy it. For example, there are a lot of Central and South Florida Flood Control canals whose spoil banks are still there unsold.
Q. If you did remove the fill either by selling it or otherwise utilizing it, you would not need that area for disposal, would you?
A. Offhand, I would say no, but I am not sure of that.
Q. You could find something to do with it.
A. I am not sure that I have considered that contingency very carefully."
A public service corporation should never appropriate in excess of what is reasonably necessary to answer the public purpose in view. See Florida Power Corporation v. Wenzel, Fla.App. 1959, 113 So.2d 747; 29A C.J.S. Eminent Domain § 92.
There was no showing, or adequate proof by the power company that this "storage land" was necessary for public use within a reasonable time in the future.
Generally, condemning more property than is needed for a public use is held to be a denial of due process. 26 Am.Jur.2d Eminent Domain § 115. When the sovereign delegates the power to condemn to a political unit or agency, a strict construction will be given against the agency asserting the power and the power to take private property in every case is limited to such and so much as is necessary for the public use in question. Wilton v. St. Johns County, supra; Brest v. Jacksonville Expressway Authority, Fla. App. 1967, 194 So.2d 658, 20 A.L.R.3d 854. *52 The question of whether there is any need or necessity for the particular estate sought to be condemned is proper for judicial review and determination. Wilton v. St. Johns County, supra, and Miller v. Florida Inland Navigation District, Fla.App. 1961, 130 So.2d 615.
We do not find any substantial competent evidence in the record on appeal to justify a taking of fee simple title to the land sought to be condemned and used by the power company for permanent storage of the muck and rock material excavated for this canal. Inasmuch as there are no roads to this particular property at the present time, it would appear necessary that the power company acquire, by condemnation, an easement of necessity for a sufficient period of time or an estate for years to permit it to store and dispose of this excavated material. § 73.021, Fla. Stat., F.S.A.
We find a departure from the essential requirements of law in granting the power company fee simple title to the real property other than that necessary for the proposed canal, two roads and buffer zones. On remand, evidence should be taken in order to properly determine the length of time and type of easement necessary or the estate for years necessary to accomplish the excavation, storage and disposal of the material excavated for the canal.
Seadade next asserts that this taking was not for a valid public purpose. We have considered the arguments advanced by the petitioner in this regard and find them to be without merit. See Union Electric Company v. Jones, Mo. 1962, 356 S.W.2d 857 (impounding water, flooding real estate and protection of generating plant); Ohio Power Co. v. Deist, 154 Ohio St. 473, 96 N.E.2d 771 (1951) (belt conveyor system to transport coal from coal field to generating station four miles distant); Toler v. Pennsylvania Public Utility Commission, 185 Pa.Super. 222, 138 A.2d 221 (1958) (disposal and storage area for coal ash); and Atkinson v. Carolina Power & Light Company, 239 S.C. 150, 121 S.E.2d 743 (1961) (cooling lake or reservoir).
Finally, it argues that the permission or authorization of certain governmental agencies is necessary and must be obtained before this real property or canal can be used and that since the power company has not obtained such permission and authorization the taking is not for a public purpose.
In the case of Town of Sudbury v. Department of Public Utilities, 351 Mass. 214, 218 N.E.2d 415, 423 (1966), the construction of an electric transmission line was resisted on the ground that the condemnor did not have prior governmental approval to run the lines in question through the public streets. The court said:
"Obviously, all acts which must be performed before a transmission line can be constructed cannot be performed simultaneously."
and, as stated in 6 Nichols, Eminent Domain § 24.63, at 68-69:
"In the absence of a statute requiring the consent of a municipality or other public board or officer as a condition precedent to the institution of condemnation proceedings, such consent need not be obtained. Even where such consent is statutorily required, it may not be the basis of an objection by the condemnee unless the obtaining of such consent is expressly made a condition precedent."
There are no conditions precedent in the statutes or law of Florida requiring that such consent or approval be obtained in advance of the filing of the petition or of the Order of Taking. See 29A C.J.S. Eminent Domain § 225.
In Carlor Co. v. City of Miami, Fla. 1953, 62 So.2d 897, Justice Mathews stated on p. 902:
"It is not necessary that a political subdivision of the state have money on hand, plans and specifications prepared and all other preparations necessary for *53 immediate construction before it can determine the necessity for taking private property for a public purpose."
The same logic applies here. The power company has done all that was legally required of it at the time the petition was filed and the Order of Taking entered. The fact that it may have to obtain certain permits in the future is not fatal at this stage.
We have considered the other points raised by Seadade and have determined that they are not departures from the essential requirements of law.
The Petition for Writ of Certiorari is granted. The Order of Taking is affirmed in all parts except that part vesting fee simple title in the power company to the real property required for storage of the muck and rock material excavated from the land for the canal. As to that real property, the Order of Taking is quashed and the cause remanded for the taking of testimony and evidence to determine the length of time and type of easement or the estate for years necessary for the power company to reasonably accomplish its purpose in the use of this land for storage and disposal purposes.
It is so ordered.
NOTES
[1] Fortune, The Limited War on Water Pollution, p. 197, February, 1970.