## CARROLL ELECTRIC COOPERATIVE CORPORATION, Plaintiff–Appellant,

v.

Mary E. LAMBERT, and Ralph F. Lambert, and First National Bank of Berryville, and Ellis, Cupps & Cole, Trustee, and William Darch, and Frances Bon Tempo, and TAP Corporation, and Security Abstract & Title Co., Trustee for First National Bank of Berryville, and Barry County Collector, Defendants–Respondents.

Nos. SD 31416, SD 31589.

Missouri Court of Appeals, Southern District, Division Two.

Sept. 28, 2012.

Richard L. Schnake, Springfield, MO, for Appellant.

Donald L. Cupps, Cassville, MO, for Respondents Mary and Ralph Lambert, William Darch, Frances Bon Tempo, First National Bank of Berryville, and Ellis, Cupps & Cole.

Robert Denlow, St. Louis, MO, for Respondent TAP Corp., Inc.

Security Abstract & Title Co. and Barry County Collector acting pro se.

JEFFREY W. BATES, J.

This is a condemnation case. Carroll Electric Cooperative Corporation (Carroll Electric) filed a petition to condemn a right-of-way for an electric transmission and distribution line across properties owned by two couples: Ralph and Mary Lambert; and William Darch and his wife, Frances Bon Tempo (collectively, Landowners).[1] After Carroll Electric presented evidence at a hearing, Landowners moved to dismiss the action without prejudice pursuant to § 523.256.[2] The trial court granted Landowners' motion for two reasons: (1) Carroll Electric "exceeded its authority" in seeking eminent domain for "communication purposes"; and (2) Carroll Electric did not comply with all the requirements in § 523.256 and, therefore, did not engage in good faith negotiations. The condemnation petition was dismissed without prejudice, and the trial court also awarded Landowners attorney's fees and costs.

On appeal, Carroll Electric presents five points for decision. Because our decision on Points I and II resolves the entire appeal, Points III–V will not be addressed. In Point I, Carroll Electric contends the trial court erred in dismissing the petition because § 394.080.1(11) RSMo (2000) authorizes Carroll Electric to condemn property for "constructing or operating electric transmission and distribution lines or systems" and the communication lines are an essential part of the transmission and distribution system. In Point II, Carroll Electric contends the trial court erred in dismissing the petition and awarding attorney's fees pursuant to § 523.256. Carroll Electric argues that the court misapplied the law when it determined that Carroll Electric failed to comply with a good faith negotiation requirement in that statute. Because both points have merit, the summary judgment is reversed. The cause is remanded for further proceedings consistent with this opinion.

## I.  Standard of Review

"As a general rule, review of the trial court's ruling on a motion to dismiss

---

1. Carroll Electric has dismissed its appeal from the judgment in favor of another defendant, TAP Corporation.

2. All references to statutes are to RSMo Cum. Supp. (2010) unless otherwise specified. All references to rules are to Missouri Court Rules (2012).

is limited to the sufficiency of the pleadings on their face." *City of Smithville v. St. Luke's Northland Hosp. Corp.*, 972 S.W.2d 416, 419 (Mo.App.1998).[3] In this case, however, evidence beyond the pleadings was introduced prior to the dismissal. Under such circumstances, the motion to dismiss was converted into a motion for summary judgment. *See id.*; Rule 55.27(b). "Appellate review is *de novo.*" *Wyatt v. Taney County, Mo.*, 347 S.W.3d 616, 618 (Mo.App.2011). We view the evidence in a light most favorable to Carroll Electric, the party against whom the summary judgment was entered. *See City of Smithville*, 972 S.W.2d at 419. "The propriety of summary judgment is purely an issue of law. As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment." *ITT Commercial Finance Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993).

## II. Factual and Procedural Background

Carroll Electric is a member-owned rural electric cooperative that serves parts of Northwest Arkansas and Southwest Missouri. Carroll Electric's system has transmission lines that feed its substations, and there are distribution lines that run from the substations to its members. Carroll Electric has two substations in the Shell Knob, Missouri area.

Carroll Electric sought to condemn an easement for a new 69,000 volt transmission line to run from its Holiday Island substation to its Viola substation. Landowners own land at the end point of the line.

Carroll Electric intended to create a "loop feed" with which to improve reliability of its system in the Shell Knob area. This loop feed would meet the increasing demand for power in the area and thus better serve its members. Currently, the Holiday Island and Viola substations operate on radial feeds, which have one source of electricity. When an outage occurs or maintenance needs to be done, the substation must be de-energized to work on it. A loop feed, on the other hand, would result in fewer outages by enabling Carroll Electric to take one line out of service

---

3. We are aware that the "general rule is that a dismissal without prejudice is not a final judgment and, therefore, is not appealable." *Chromalloy American Corp. v. Elyria Foundry Co.*, 955 S.W.2d 1, 3 (Mo. banc 1997); *Doe v. Visionaire Corp.*, 13 S.W.3d 674, 676 (Mo. App.2000); *see Cramer v. Smoot*, 291 S.W.3d 337, 339–40 (Mo.App.2009).

Under certain circumstances, however, "[a] dismissal without prejudice may operate to preclude a party from bringing another action for the same cause and may be res judicata of what the judgment actually decided[.]" This includes decisions that would effect a practical termination of the litigation in the "form cast" or in the plaintiff's forum of choice, as well as situations in which "refiling of the petition at that time would have been a futile act."

*Cramer*, 291 S.W.3d at 339 (citations omitted). Among the exceptions, the common factor "was that the plaintiffs could not maintain their actions in the court where the action was filed if the reason for the dismissal was proper." *Doe*, 13 S.W.3d at 676; *Cramer*, 291 S.W.3d at 339. Here, Carroll Electric maintains, and we agree, that an amended or new petition would be subject to the same defense and Carroll Electric could not maintain the action if the reason for dismissal was proper. Therefore, the dismissal without prejudice had the practical effect of terminating the litigation and is appealable. *See Chromalloy*, 955 S.W.2d at 3–4. Moreover, the judgment for attorney's fees and costs is appealable as a money judgment. *See, e.g., Planned Indus. Expansion Authority of Kansas City v. Ivanhoe Neighborhood Council*, 316 S.W.3d 418, 428 (Mo.App.2010) (appeal from judgment awarding attorney's fees under § 523.256).

while still maintaining electricity for its members.

The proposed line would also cross Table Rock Lake, which requires a permit from the U.S. Army Corps of Engineers (the Corps). The Corps' safety concerns about the line included potential hazards to airplane traffic and parasailers on the lake. Carroll Electric employed Finley Engineering (Finley) to address engineering issues and work with the Corps. Bryce Barton (Barton) was a Finley engineer working on the project. According to Barton, the crossing points were chosen through "a collaborative effort that began with working with [the Corps] to determine an acceptable crossing site of the lake." It "took a long time to identify a site that was acceptable to them as well as us." Preliminary consultation with [the Corps] had begun in 2006. Carroll Electric submitted its final site plan in the summer of 2010. The Corps approved the project in late 2010 or early 2011.

In early 2010, Finley contacted Landowners about the project on behalf of Carroll Electric. In August 2010, Finley mailed 60–day notices of "Intended Acquisition for Electric Line Easement" to Landowners by certified mail pursuant to § 523.250. The notices described an "improvement project" that would "include the installation of a 69,000 volt transmission line that will improve the reliability of the electrical service in the area." Barton testified that, within 30 days after the notice was mailed, Finley received no written request from Landowners to relocate the easement, as provided under § 523.265.

In December 2010, Carroll Electric mailed an "Offer Letter" to each of the Landowners, offering to purchase their respective easements for a stated price. Attached to the Offer Letter was a proposed right-of-way easement, which as to each Landowner was described in part as:

the perpetual easement and right to enter upon the lands of the Grantor ... to erect, operate, survey, maintain ... one or more electric power transmission and/or distribution line(s) and appurtenant communication lines ... and to license, permit, or otherwise agree to the joint use or occupancy of the line or system by any other person, association or corporation for electrification **or communication purposes** together with the right of ingress and egress to, from, and over said lands for doing anything necessary or useful to the enjoyment of the easement herein granted...."

(Emphasis added.) Each Offer Letter also included a legal description of the proposed easement, a drawing depicting the location of the easement, and a "Summary Appraisal Report."

In January 2011, Carroll Electric filed this action. The condemnation petition alleged that Carroll Electric was exercising the power of eminent domain granted by § 394.080.1(11) and § 523.010 RSMo (2000) "to condemn private property for the construction upon and use of such property" for the purpose of "the installation of a sixty-nine (69) KV transmission line with an electric distribution line to improve the reliability of electric service for the Shell Knob, Missouri area." The petition further alleged that Carroll Electric had attempted to negotiate with Landowners as to the proper compensation to be paid and that Carroll Electric had "made a good faith effort to reach a compromise with [Landowners] on the price for the property, and all required notices and prerequisites have been met prior to the filing of this Petition in Condemnation as required by law." Landowners denied these allegations.

In April 2011, a hearing was held, at which Carroll Electric called several witnesses, including Barton. With respect to

communication, Barton testified that "[e]specially in light of, you know, recent developments in smart grid, communication between substations is essentially critical for the operation of transmission [and] distribution networks." Also testifying was James Allen (Allen), an engineering technician employed by Carroll Electric. During cross-examination, Allen acknowledged that the proposed easements referenced "communications" but Allen testified that Carroll Electric did not seek to condemn for both "electric and telecommunications" but for "[j]ust electric." As to whether "with telecommunication [Carroll Electric] could allow anyone to string fiber telephone, cable TV, any of that on this easement," Allen said that Carroll Electric "would not allow them on our transmission lines." Allen clarified that "[i]t would allow them to be on our poles, but that doesn't give them the right to be on ... our easement. They'd have to get their own easement."

Landowners offered no evidence, but instead orally moved to dismiss the proceedings. They argued that Carroll Electric had statutory authority "to condemn the power line" but that it had sought something it was not entitled to because it had "essentially tried to slip in this communications on all of the action."

After taking the matter under advisement, the court dismissed the condemnation petition without prejudice. The court noted the language of the proposed easement for "communication purposes" and explained that § 394.080.1(11) RSMo (2000) grants the power of eminent domain to cooperatives for "constructing or operating electric transmission and distribution lines or systems. However no power of eminent domain is granted for 'communication purposes.' "

The court also decided that, although Carroll Electric furnished Landowners with the Summary Appraisal Reports, the reports failed to comply with statutory appraisal requirements. The court determined that Carroll Electric failed to prove "that the appraisals rendered on behalf of [Carroll Electric] were performed by state-licensed or state-certified appraisers" using "generally accepted appraisal practices" as required by § 523.256 to show good faith negotiations. Accordingly, the court decided that "not only has [Carroll Electric] exceeded its authority as set forth in 394.080 RSMo but also has failed to meet the requirements of 523.253 RSMo. and 523.256 RSMo as outlined hereinbefore and as a result of such failure, the Court must find that good faith negotiations have not occurred." The court dismissed the condemnation petition without prejudice. In addition the court awarded Landowners their attorney's fees and costs pursuant to the provisions of § 523.256. The dismissal without prejudice and the respective awards of Landowners' attorney's fees and costs were included in a second amended judgment, from which Carroll Electric appeals. Additional facts necessary to the disposition of the case are included below as we address Carroll Electric's points of error.

## III. Discussion and Decision

### Point I

██ In Carroll Electric's first point, it contends the trial court misapplied the law by dismissing the condemnation petition on the ground that § 394.080.1(11) grants no power of eminent domain for "communication purposes." Section 394.080.1 provides that "[a] cooperative shall have power: ... [t]o exercise the power of eminent domain in the manner provided by the laws of this state for the exercise of that power by corporations constructing or operating electric transmission and distribution lines or systems[.]" § 394.080.1(11)

RSMo (2000). Carroll Electric argues that the proposed condemnation is within that authority because the "proposed easements are for 'electric power transmission and/or distribution line(s) and appurtenant communication lines,' the communication lines are an essential part of the transmission and distribution system, and the 'communication' can occur only through lines appurtenant to those that transmit and distribute electricity." For the purpose of determining whether summary judgment was properly granted, we agree.

■ The reference in § 394.080.1(11) to Missouri laws governing the exercise of condemnation power by "corporations constructing or operating electric transmission and distribution lines or systems" invokes the provisions of § 523.010 governing, *inter alia*, condemnation of private property by rural electric cooperatives. In relevant part, that statute states:

> In case land, or other property, is sought to be appropriated by . . . any electrical corporation organized for the manufacture or transmission of electric current for light, heat or power, including the construction, when that is the case, of necessary dams and appurtenant canals, flumes, tunnels and tailraces and including the erection, when that is the case, of necessary electric steam powerhouses, hydroelectric powerhouses and electric substations . . . and such corporation and the owners cannot agree upon the proper compensation to be paid . . . such corporation may apply to the circuit court of the county of this state where such land or any part thereof lies by petition . . . .

§ 523.010.1 RSMo (2000). "[T]he power of eminent domain extends to the acquisition of the necessary land for each and every essential part of the project." *Union*

*Electric Co. v. Jones,* 356 S.W.2d 857, 861 (Mo.1962).

In *Union Electric,* our Supreme Court addressed a similar argument that an electric company was taking land "for purposes not included in the statutes." *Id.* There, Union Electric sought to condemn Jones' land for a planned hydroelectric generating facility. *Id.* at 858. The hydroelectric facility included a dam, which would form a lower pool, and an upper pool at a substantially higher elevation. *Id.* The operation was to be controlled electronically from St. Louis. *Id.* at 859. With respect to Jones' land, only about half would be flooded. *Id.* at 861. Union Electric nevertheless sought to condemn all of it. *Id.* On the part that would not be flooded, Union Electric planned to install a high-voltage transmission line "and a communication or control cable carrying 16 to 20 circuits" to be "used in the remote control operation of the facilities." *Id.* The petition alleged that Union Electric needed the balance of the land "for impounding water thereon, flooding the said real estate, and the protection of the highhead pumped storage electric generating stations, including all the major components thereof, and the necessary security measures therefor." *Id.*

Jones argued that Union Electric could not condemn land for "protection" or for the "necessary security measures" because there was no statutory power to condemn for those purposes. *Id.* Our Supreme Court rejected that argument for the following reason:

> The protection and security of a 50–million dollar remote controlled generating facility is just as much an essential part of the overall project as any other feature thereof. The project admittedly is for a public use, and the power of eminent domain extends to the acquisition of the necessary land for each and

every essential part of the project. The power to locate the project and to determine the extent of land necessary for economical and proper construction is vested by legislative act in the sound discretion of Union Electric uncontrolled by the courts except as to the issues of fraud, bad faith, or an arbitrary and unwarranted abuse of discretion; issues which are not in this case. Union Electric's evidence established that all the land of appellants was reasonably necessary for the construction and the proper operation, and maintenance of the project.

*Id.*[4]

Based upon the facts which we must assume to be true for the purpose of reviewing this summary judgment, we reach the same conclusion here. Barton testified that "communication between substations is essentially critical for the operation of transmission [and] distribution networks." By ruling that Carroll Electric "exceeded its authority" because "no power of eminent domain is granted for 'communication purposes[,]'" the trial court would effectively preclude Carroll Electric from installing and using those lines for its own communications to operate its electrical system. Assuming the facts presented at the evidentiary hearing are true, Carroll

Electric's condemnation power under § 394.080.1(11) and § 523.010 RSMo (2000) is broad enough to permit it to condemn an easement for communication lines appurtenant to its electric transmission and distribution system. The court misapplied the law in reaching a contrary conclusion.

On appeal, Landowners concede that Carroll Electric may condemn an easement that includes the right to install "appurtenant communication lines" to operate its electrical system. Landowners argue, however, that Carroll Electric exceeded its statutory powers to condemn in this case. According to Landowners, the easement to permit "joint use or occupancy" by others for "communication purposes" has "no connection whatever" to Carroll Electric's stated purpose to provide electricity. Landowners complain that "[t]he plain reading of the easement Carroll Electric sought to condemn means Carroll Electric could allow ATT, Centurylink, Mediacom, Verizon, or any entity in the telecommunication business to utilize Carroll Electric's easement for 'communication purposes.'"

In response, Carroll Electric argues that the joint occupancy provision in these easements allow other electric cooperatives to buy and sell electricity to each other.[5]

4. Carroll Electric cites two other Supreme Court of Missouri decisions that illustrate the breadth and importance of appurtenant, necessary uses of condemned property. *See, e.g., Eureka Real Estate & Inv. Co. v. Southern Real Estate & Financial Co.,* 355 Mo. 1199, 200 S.W.2d 328, 330–31 (1947) ("the whole purpose for which the easement had been created was not at an end, there was yet a necessary incidental purpose to be served, the supplying of power for the operation of streetcars over that part of the line on which 'service' had not been discontinued ... [t]he evidence certainly does not show ... abandonment"); *Coates & Hopkins Realty Co. v. Kansas City Terminal Ry. Co.,* 328 Mo. 1118, 43 S.W.2d 817, 824 (1931) (holding "that the land in litigation is

appurtenant to the purposes of the new Union Passenger Station, and that it is now used for the purposes for which it was condemned, resulting that evidence fails to show an abandonment of the use"). Like *Union Electric,* both of these cases support Carroll Electric's argument.

5. Carroll Electric further explains that the joint occupancy provisions in this case are "particularly important because these easements position Carroll Electric to cross the lake at points that [the Corps] has approved— it would allow Carroll Electric to avoid a condemnation action by another cooperative that otherwise might seek to condemn an

Additionally, Carroll Electric points out that any use other than for electricity is an expanded use of the proposed easements which would be prohibited by § 523.283 without a new condemnation action or a negotiated expansion of the existing easement. Assuming the facts presented at the evidentiary hearing are true, we agree.

Section 523.283 states:

1. Easements or right-of-way interests acquired after August 28, 2006, by a private utility company, public utility, rural electric cooperative, municipally owned utility, pipeline, or railroad, by either formal condemnation proceedings or by negotiations in lieu of condemnation proceedings, are fixed and determined by the particular use for which the property was acquired as described in either the instrument of conveyance or in the condemnation petition. *Expanded use of the property beyond that which is described in the instrument of conveyance or the condemnation petition shall require either an additional condemnation proceeding in order to acquire the additional rights or by new negotiations for the expanded use of the property and appropriate consideration and damages to the current owner of the property for the expanded use.*

2. For purposes of this section, the term "expanded use" shall mean:

(1) The exclusion of use by the current owner of the burdened property from an area greater than the area originally described at the time of acquisition by the condemning authority; or

(2) An increased footprint or burden greater than the footprint or burden originally described in the instrument of conveyance or condemnation petition. As used in this subdivision, the term "increased footprint or burden" shall mean a different type of use or a use presenting an unreasonably burdensome impact on the property, the landowner, or the activities being conducted on the property by the landowner.

3. Commissioners appointed by the court under section 523.040 and, where applicable, a jury on a trial of exceptions from the commissioners' award shall be entitled to assume, in assessing the just compensation due for a taking, that the condemning authority shall exercise, from and after the date the property interest is acquired, each and every right acquired to the fullest extent allowed by the condemnation petition.

*4. If a property owner prevails in an action for trespass or expanded use against a private utility company, public utility, rural electric cooperative, municipally owned utility, pipeline, or railroad, such property owner may be awarded reasonable attorneys' fees, costs, and expenses.*

*Id.* (emphasis added). Thus, § 523.283 provides specific protections and remedies to the landowner in the event expanded use of the condemned property takes place. *See, e.g., Sterbenz v. Kansas City Power and Light Co.,* 333 S.W.3d 1 (Mo. App.2010) (discussing a provision of § 523.283 in a trespass action by landowners against utility after an electric line was installed on property where utility lacked an easement). Here, the 60–day notices described the particular use of the proposed easement for "the installation of a 69,000 volt transmission line that will improve the reliability of the electrical service in the area." Likewise, Carroll Electric stated in its condemnation petition that Landowners' property was sought for "the installation of a sixty-nine (69) KV transmission line with an electric distribution line to improve the reliability of elec-

easement for electric or communications purposes across Carroll Electric's lines."

tric service for the Shell Knob, Missouri area." At the hearing, Allen testified that Carroll Electric did not seek to condemn for both "electric and telecommunications" but for "[j]ust electric." Allen clarified that for any other use by others, "[t]hey'd have to get their own easement." Thus, nowhere in the record is there any evidence of the proposed easements' use other than for electric service. Any other "expanded use" would be prohibited by § 523.283, absent a new condemnation action or a negotiated expansion of the existing easement.[6] Carroll Electric's evidence, which we must accept as true in reviewing the trial court's grant of summary judgment, further established that "communication between substations is essentially critical" to provide electrical service. *See Union Electric*, 356 S.W.2d at 861 (power of eminent domain extends to "each and every essential part of the project"). Accordingly, the trial court erred in dismissing the condemnation petition without prejudice on the ground that Carroll Electric "exceeded its authority" because "no power of eminent domain is granted for 'communication purposes.'" Point I is granted.[7]

## Point II

In Carroll Electric's second point, it contends that the trial court erred by dismissing the condemnation petition and awarding Landowners attorney's fees and costs on the ground that good faith negotiations did not occur as required by § 523.256. The following additional facts are necessary to discuss this point.

A "Summary Appraisal Report" was attached to each of the Landowners' Offer Letters. Each Summary Appraisal Report generally included the following: the identity of the fee owners; the owners' mailing address; the location of subject property; a description of subject property; a description of the area of the whole, area of acquisition, and area of remainder; a description of the basis for the condemned land's estimated value; the purpose of the appraisal; its intended use; its intended users; the property rights appraised; the effective date; date prepared; scope of work; highest and best use; exposure time; discussion of severance damage; discussion of enhanced value; history; sales comparison approach; and subject photographs, which included an aerial photo showing easement area. Although the reports referred to a legal description and survey of each property, neither was attached to the report.

At the hearing, Landowners' counsel argued that Carroll Electric "didn't send an appraisal. They sent part of an appraisal...." When Landowners' counsel ques-

---

**6.** Landowners do not mention § 523.283, but instead rely on cases involving expanded uses that predate the statute's enactment in 2006. *See, e.g., Eureka Real Estate & Inv. Co. v. Southern Real Estate & Financial Co.*, 355 Mo. 1199, 200 S.W.2d 328 (1947); *Ogg v. Mediacom, L.L.C.*, 142 S.W.3d 801 (Mo.App. 2004).

**7.** At oral argument, Landowners argued that the easement language permitting "joint use or occupancy" was an additional use of the easement that should have been included in the 60–day notices. Consequently, the failure to include such use in the notices invalidates the notices and requires Carroll Electric to

start all over again, sending new 60–day notices that include the additional use. We are unpersuaded by this argument. Carroll Electric has consistently stated in the notices, its petition and through testimony at the hearing, that the proposed easements' purpose is for "electric service." Viewing the record favorably to Carroll Electric as we must, nothing in the record suggests any additional uses inconsistent with that purpose. Moreover, to the extent the language of the proposed easement is overbroad, the language is as yet only proposed and subject to change by agreement or by the trial court.

tioned Allen about it, Allen agreed that the reports were actually summaries of appraisals. Carroll Electric argued that these summaries provided a determination of the value of property for purposes of its offer.

In dismissing the condemnation petition without prejudice, the trial court found that Carroll Electric furnished Landowners with the "Summary Appraisal Reports." The court decided, however, that the reports failed to comply with statutory appraisal requirements. The court explained that:

> Section 523.253 RSMo. [a]nd 523.256 RSMo. require the appraisals referred to therein to be made by a state-licensed or state-certified appraiser. No evidence was adduced that the appraisals rendered on behalf of the Plaintiff were performed by state-licensed or state-certified appraisers. Further, section 523.253(2) RSMo. requires not only state-licensed or state-certified appraiser but also requires that said appraiser use generally accepted appraisal practices. Although the Summary Appraisal Reports furnished to the Defendant land owners by [Carroll Electric] contain various appraisal approaches no evidence was offered regarding whether same were based upon generally accepted appraisal practices as required by said Statute. Said Summary Appraisal Reports do not contain the name of any appraiser.

The court concluded that "[a]lthough [Carroll Electric] has met many of the requirements set forth in Sections 523.253 RSMo. and 523.256 RSMo.[,]" it failed to comply with the appraisal requirements "as outlined hereinbefore and as a result of such failure, the Court must find that that good faith negotiations have not occurred."

■ Carroll Electric contends the trial court erred by dismissing the condemna-

tion petition on the ground that Carroll Electric failed to comply with statutory requirements for appraisals. Carroll Electric argues that: (1) § 523.253.2(1) permits a condemning authority to provide *either* an appraisal *or* "an explanation with supporting financial data for its determination of the value of the property for purposes of the offer"; (2) the trial court ignored the alternative method of showing support for the offer; and (3) the court misapplied the law in focusing only on the appraisal requirements and concluding, on that basis alone, that Carroll Electric did not engage in good faith negotiations as required by § 523.256. Assuming the facts presented at the evidentiary hearing are true, we agree.

Section 523.256, which sets out the requirements for what constitutes good faith negotiations, states:

> Before a court may enter an order of condemnation, the court shall find that the condemning authority engaged in good faith negotiations prior to filing the condemnation petition. A condemning authority shall be deemed to have engaged in good faith negotiations if:
>
> (1) It has properly and timely given all notices to owners required by this chapter;
>
> (2) Its offer under section 523.253 was no lower than the amount reflected in an appraisal performed by a state-licensed or state-certified appraiser for the condemning authority, provided an appraisal is given to the owner pursuant to subsection 2 of section 523.253 *or, in other cases, the offer is no lower than the amount provided in the basis for its determination of the value of the property as provided to the owner under subsection 2 of section 523.253;*
>
> (3) The owner has been given an opportunity to obtain his or her own appraisal from a state-licensed or state-certified appraiser of his or her choice; and

(4) Where applicable, it has considered an alternate location suggested by the owner under section 523.265.

If the court does not find that good faith negotiations have occurred, the court shall dismiss the condemnation petition, without prejudice, and shall order the condemning authority to reimburse the owner for his or her actual reasonable attorneys' fees and costs incurred with respect to the condemnation proceeding which has been dismissed.

*Id.* (emphasis added). Thus, § 523.256(2) permits a condemning authority to fulfill its obligation of providing an explanation of the basis for its offer by either of the methods set forth § 523.253.2.

Section 523.253 states:

1. A condemning authority shall present a written offer to all owners of record of the property. The offer must be made at least thirty days before filing a condemnation petition and shall be held open for the thirty-day period unless an agreement is reached sooner. The offer shall be deposited in the United States mail, certified or registered, and with postage prepaid, addressed to the owner of record as listed in the office of the city or county assessor for the city or county in which the property is located. The receipt issued to the condemning authority by the United States Post Office for certified or registered mail shall constitute proof of compliance with this requirement; provided, however, that nothing in this section shall preclude a condemning authority from proving compliance with this requirement by

other competent evidence. Nothing in this section shall prohibit the parties from negotiating during the thirty-day period.

2.(1) Any condemning authority shall, at the time of the offer, provide the property owner with an appraisal *or an explanation with supporting financial data for its determination of the value of the property for purposes of the offer made in subsection 1 of this section.*

(2) Any appraisal referred to in this section shall be made by a state-licensed or state-certified appraiser using generally accepted appraisal practices.

*Id.* (emphasis added). Thus, § 523.253.2 requires the condemning authority to provide the property owner with *either* "an appraisal," which must be "made by a state-licensed or state-certified appraiser using generally accepted practices," *or* "an explanation with supporting financial data for its determination of the value of the property for purposes of the offer[,]" which is not subject to the same appraisal requirements. *Id.* Similarly, § 523.256(2) provides that, if the condemning authority provides the latter, it satisfies the good faith valuation requirement if its "offer is no lower than the amount provided in the basis for its determination of the value of the property."

Here, the trial court specifically found that Carroll Electric furnished Landowners with the "Summary Appraisal Reports," not "appraisals," yet the court applied the statutory requirements for appraisals.[8] It is evident that the court

---

8. Landowners argue the trial court "implicitly found that Carroll Electric was proceeding by the appraisal method." The court, however, expressly found that Carroll Electric furnished "Summary Appraisal Reports," which were summaries or parts of appraisals, not full appraisals. Landowners further argue that Carroll Electric did not comply with oth-

er provisions of § 523.256 concerning notice requirements and consideration of alternative locations. *See* § 523.256(1) and (4). This argument, however, ignores the court's findings. The court found that Carroll Electric "met many of the requirements" of §§ 523.253 and 523.256, and that Carroll Electric's only shortcoming was that the Sum-

did not even consider whether the Summary Appraisal Reports satisfied the alternative method of providing "an explanation with supporting financial data for its determination of the value of the property for purposes of the offer[.]" § 523.253.2(1). By ignoring this alternative, the trial court misapplied the law. Because failure to comply with the appraisal requirements was the only basis upon which the court determined that Carroll Electric did not engage in good faith negotiations, the court erred in determining that good faith negotiations did not occur in this case.

Landowners concede that, in the event this Court determines "the trial court erred in finding Carroll Electric did not engage in good faith negotiation under RSMo. § 523.256, the trial court has no authority to award attorneys' fees and costs under § 523.256." Accordingly, we similarly conclude that the trial court erred in awarding attorney's fees and costs to Landowners pursuant to § 523.256. Point II is granted.

The trial court erred by dismissing Carroll Electric's condemnation petition without prejudice and by awarding attorney's fees and costs to Landowners. Therefore, we reverse the second amended judgment. The cause is remanded for proceedings consistent with this opinion.

NANCY STEFFEN RAHMEYER, J., and DON E. BURRELL, C.J., concur.

mary Appraisal Reports did not satisfy the requirements for appraisals under § 523.256(2) and § 523.253.2(2).