245 So.2d 209 (1971)
SEADADE INDUSTRIES, INC., a Florida Corporation, Petitioner,
v.
FLORIDA POWER & LIGHT COMPANY, a Florida Corporation, Respondent.
No. 39557.
Supreme Court of Florida.
February 3, 1971.
Rehearing Denied March 31, 1971.
*210 Helliwell, Melrose & DeWolf and Brigham & Brigham, Miami, for petitioner.
McCarthy, Steel, Hector & Davis, James H. Sweeny, III, and Dennis G. King, Miami, for respondent.
CARLTON, Justice.
This eminent domain case involves the authority of a Utility to secure condemnation of adjacent lands prior to gaining ultimate approval by appropriate authorities of the project for which the land is to be condemned. Circuit Court, Dade County, entered an Order of Taking in behalf of the Utility, Florida Power & Light Company, granting to it a fee simple interest in properties neighboring its Turkey Point facilities for the purpose of constructing and maintaining a discharge water drainage canal 4.5 miles in length and, including access and related areas, 660 feet in width.
On petition for writ of certiorari addressed to that Order, the District Court of Appeal, Third District, affirmed the taking, but required modification of the quality of the title for approximately 430 of the 660 feet width given in fee simple. See 232 So.2d 46 (3rd D.C.A.Fla. 1970). We have taken jurisdiction in order to resolve a conflict between the District Court's opinion and our previous decision in Robertson v. Brooksville & Inverness Railway, 100 Fla. 195, 129 So. 582 (1930). See Article V, Section 4(2), Florida Constitution, F.S.A.
The District Court's opinion sets out the multiple issues operative in this cause. These issues will not be detailed or discussed here save to the extent appropriate to our treatment of the case. Briefly, stated, the situation is as follows. The Utility operates electrical generating facilities just north of petitioner Seadade's unimproved marshland fronting to the East on lower Biscayne Bay and Card Sound. The Utility proposes to cool two new generators by drawing water from Biscayne Bay, circulating the waters through the generating facilities, and then discharging the waters through a canal into Card Sound. The canal would cut through Seadade's property for a distance of 4.5 miles. Seadade had attempted to resist the taking on numerous grounds, all of which center on the related propositions that the canal project does not comport with public interest, and that condemnation constitutes a gross abuse of discretion by the Utility.
Turning now to a close examination of Seadade's position, we find that it concedes the Utility has the power and authority to condemn land for a proper purpose under Fla. Stat. § 361.01, F.S.A., and our decision in Demeter Land Co. v. Florida Public Service Co., 99 Fla. 954, 128 So. 402 (1930). But it argues tht the Utility has failed to show any necessity of valid public purpose for the taking in question. Fundamental to Seadade's position is its contention that the discharge project must be approved by Federal, State and local *211 authorities before any discharge can begin. Because of thermal pollution aspects, Seadade maintains that there is so imminent a likelihood that thesse authorities will reject the project, or require substantial modification of it, that condemnation is premature, and that the Utility is grossly abusing the discretion vested in it by seeking condemnation. We quote from Seadade's Answer filed in response to the Utility's Summons to Show Cause:
"Petitioner's proposed canal project would be contrary to the public interest in that it would provide for the discharge of heated water into the waters of Biscayne Bay opposite this Defendant's upland property and would cause great damage to the ecology of Biscayne Bay and would cause the death and destruction of marine life, both plant and animal, in Biscayne Bay. Petitioner's proposed canal project would also be contrary to the public interest in that it would concentrate the effects of the alteration in water conditions caused by the Plant in the Card Sound area of Biscayne Bay which is known to be a body of water not subject to tidal flushing, and would cause a residual build up of all adverse factors created by the plant effluent. The plant effluent which would be discharged from the canal into Biscayne would also contain harmful radio-active material from the nuclear powered generating plant proposed by Petitioner at Turkey Point as well as other harmful effluents from said plant.
"The facts are well established that such discharge of heated effluent from the canal into Biscayne Bay would violate the ordinances of Dade County, Laws of the State of Florida, and the Rules and Regulations of the U.S. Department of the Interior, and would seriously adversely affect the flood control program and salt water intrusion prevention program of the Central and Southern Florida Flood Control District. Before the proposed canal project could be undertaken, the Petitioner must obtain approval for the program and the discharge of the effluent into the water of Biscayne Bay from the following Agencies and Boards:
a. The U.S. Atomic Energy Commission
b. The U.S. Department of the Interior
c. The Florida Anti-Pollution Control Board
d. Dade County Anti-Pollution Control
e. Central and Southern Florida Flood Control District
"Petitioner has not been granted approval, permit or license by any of the above-named Agencies and Boards, and in fact has been specifically denied approval by some of the above-named Agencies, and, therefore, is not in a position to undertake the proposed canal project."
Seadade points out that in the case of Robertson v. Brooksville & Inverness Railway, supra, this Court held that a railroad was not entitled to pursue condemnation proceedings leading to a taking of land over which a pipeline to a waterhole was to be constructed, when it had not secured the right to use the waterhole. In that case it was said:
"Before asking the court to condemn a right of way for a pipe line to the waterhole, the railway company should have first secured by purchase or contract the right to take water therefrom, or should have purchased the land on which the water is located, or, failing in this, it should have acquired the same by condemnation, either in a previous action, or by condemnation thereof in this same proceeding by which it seeks the right to reach it with its pipe line. On the case as made by the answer, the court is asked to allow the exercise of the vast power of eminent domain to give the railway company access to water which it has no *212 present or prospective right to use, and which it cannot use without committing an unlawful trespass. As we understand them, the authorities do not countenance any such exercise of the power." 100 Fla. at 205, 129 So. at 586.
Seadade also relies upon a recent case decided by the Third District Court of Appeal a few days after its Seadade decision; in City of Miami Beach v. Manilow, 232 So.2d 759 (3rd D.C.A.Fla. 1970), the District Court held that a City was not entitled to bring condemnation proceedings for the taking of property for a road when it had failed to secure permission of the State Road Department in advance. From the holdings in Robertson and Manilow, Seadade draws the conclusion that the Utility was not entitled to bring condemnation proceedings before obtaining approval for its discharge project.[1]
The Utility's response is three-fold. First, it asserts that the canal is necessary to its operation of the Turkey Point facilities. The Utility currently operates two gas and oil-fired power generators at Turkey Point, a site located about 25 miles south of the City of Miami on the lower reaches of Biscayne Bay. These generators are the prime source of electric power for Dade County. According to the Utility, it has been unable to keep pace with power demands since 1960. In 1960, the peak load in Dade County approximated 800,000 KW, whereas the Utility only had a generating capacity of 500,000 KW. As of 1969, the Utility was sustaining a 2,000,000 KW load whereas its generating capacity was limited to 1,300,000 KW. The difference is made up by bringing into the County power generated elsewhere a practice that involves economic penalties and problems of reliability. To avoid these penalties and problems, and meet its responsibilities, the Utility constructed its existing facilities consisting of two generating units of 432,000 KW each at Turkey Point; similarly, this is why it is now constructing two 760,000 KW nuclear-fueled units due for operation in 1971.
The Utility informs us that every power plant has a cooling and circulating water system for the condenser cooling system which is necessary to the process of generating electricity. The Utility has had to consider precisely what type of system would be appropriate for its new generating facilities; these would require a circulation of 1,800,000 gallons of water per minute, and the heat transfer involved would raise the temperature of this water by as much as 15° Fahrenheit. The existing facilities use water taken directly from Biscayne Bay; after circulation through the system, this water is discharged back into the Bay at a point fairly close to the point of intake. It was realized that it would not be desirable, either from an engineering or an environmental standpoint, to use the present intake-discharge cooling system for the new facilities. Were this done, more heated water would be circulated into the Bay than the Bay could handle; that is to say, the Bay temperature would rise progressively without there being sufficient heat transfer throughout the Bay to cool the discharge waters before they were brought back into the system. This cumulative temperature rise would reduce the efficiency of the plant and at the same time endanger the marine life in the Bay.
Alternative methods of securing cooling were examined. Cooling towers, cooling ponds, spray ponds, ocean outfall, deep wells and closed circuit air cooling systems were all rejected for one or more of the following reasons: (1) excessive costs; (2) existing technology was insufficient; (3) no experience was available as to reliability or maintenance at scale required; (4) danger of salt intrusion into underlying fresh water; (5) severe operational difficulties. The one viable solution, one which was expected to achieve desirable results while avoiding the problems of the *213 other alternatives, was to modify the existing intake-discharge system by utilizing the waters of Biscayne Bay for intake and the waters of Card Sound for discharge. This would eliminate the temperature cumulation problem of direct discharge into Biscayne Bay. By the time water particles discharged into Card Sound reached the intake point in Biscayne Bay, they would have lost heat sufficiently to again be efficient coolants. Accordingly, a canal was designed to achieve the proper distance between intake in the Bay and discharge in the Sound. The Canal route fell across Seadade's lands, and so condemnation proceedings were commenced by the Utility.
Second, the Utility asserts that it has conformed to all statutory requirements regarding condemnation and taking. Fla. Stat. § 361.01, F.S.A. provides that the president and directors of a utility may appropriate lands necessary to the business contemplated by the charter. Following determination that the canal was essential and necessary, these corporate officers of the Utility adopted formal resolutions ordering that proceedings be begun. Subsequently, a petition in condemnation was filed under Fla. Stat. § 73.021(1), F.S.A., setting forth the Utility's authority, the use of the property to be condemned, and the necessity of the use; the petition included the statement of good faith intention to construct the project as required by Fla. Stat. § 73.021(2), F.S.A. Seadade was summoned under Fla. Stat. § 73.031 to show cause why the canal land should not betaken. Concurrently, the Utility sought possession in advance of judgment as provided for by Fla. Stat. § 74.011, F.S.A.; a Declaration of Taking was filed pursuant to Fla. Stat. § 74.031, F.S.A. Hearings on the Declaration were entertained by the Circuit Court, Dade County, in accord with Fla. Stat. § 74.051, F.S.A., and subsequently, by Order of that Court, upon payment of proper deposit, title of the condemned land vested in the Utility under Fla. Stat. § 74.061, F.S.A.
Third, the Utility maintains that the condemnation process may not be disturbed unless the landowner can demonstrate fraud, bad faith or gross abuse of discretion. Adams v. Housing Authority of Daytona Beach, 60 So.2d 663 (Fla. 1952); Inland Waterway Development Co. v. Jacksonville, 38 So.2d 676 (Fla. 1948); Wilton v. St. John's County, 98 Fla. 26, 123 So. 527 (1929). According to the Utility, Seadade has failed to demonstrate the existence of any of these conditions.
The District Court, 232 So.2d 46 (3rd D.C.A.Fla. 1970), held that the Circuit Court had properly entered its Order of Taking; that the Utility demonstrated both necessity, and that its taking was for a valid public purpose; that the fact that the Utility needed to secure permission from various agencies before it could put its project into operation, and use the canal it sought to condemn, was not significant so far as the condemnation proceedings were concerned; and that fee simple was an appropriate quality of title for the canal and its access roads, but that an easement or term of years was appropriate for the remainder.
We agree with the District Court's rulings on all of these issues, except for the holding that the necessity for the approval of the cooling system project was not significant in condemnation proceedings. We have consistently held that even though statutory requirements regarding condemnation and taking appear to have been satisfied, the action will be overthrown or prohibited if a gross abuse of discretion is apparent (Wilton v. St. Johns County, supra; Robertson v. Brooksville & Inverness Ry., supra), or if it can be shown that because of the passage of time and changed conditions, the public interest will be impaired (Zabel v. Pinellas County Water & Nav. Con. Auth., 171 So.2d 376 (Fla. 1965)). A utility does not have within the discretion accorded to it, the right to act in violation of the public interest. Similarly, it does not have within the discretion accorded to it the right to act precipitously *214 when the public interest has not been ascertained.
Article II, Section 7, Florida Constitution, F.S.A., contains a declaration that the protection of our natural resources shall be the policy of the State. The protection of resources, being a policy of the State, is an appropriate matter for consideration in condemnation cases. We think it logically follows that if taking and condemnation is sought in furtherance of a condemning authority's project affecting natural resources, and independent authorities guarding the public interest must approve the project before it can be put into operation, it is within the discretionary power of the judiciary to require that safeguarding of the public interest be demonstrated by the condemning authority. This is in keeping with traditional doctrine recently re-announced by this Court in Canal Authority of State of Florida v. Miller, 243 So.2d 131, filed December 16, 1970:
"In order to insure the property rights of the citizens of the State against abuse of the condemning authority's power it is imperative that the necessity for the exercise of the eminent domain power be ascertained and established. This is ultimately a judicial question to be decided in a court of competent jurisdiction. Wilton v. St. Johns County, supra; Spafford v. Brevard County, 92 Fla. 617, 110 So. 451 (1926); Robertson v. Brooksville & I. Ry., 100 Fla. 195, 129 So. 582 (1930)."
In a proper case, the judiciary may require, first, that the condemning authority reasonably demonstrate that the regulations and requirements of the independent authorities can and will be met; second, that condemnation and taking in advance of project approval will not result in irreparable damage to natural resources and environment, should the independent authorities decline to approve the proposed project.
The reasoning behind these requirements becomes apparent when the following factors are considered in this case. The Utility seeks to secure condemnation of a considerable portion of land for use "in the public interest"; specifically, it seeks to excavate and construct a discharge canal. But if, for ecological reasons, the various agencies concerned, or any one of them, should decide that discharge into the Sound is not "in the public interest," then there is the possibility that the canal cannot be utilized if the adverse decision is upheld by a court of competent jurisdiction. This leaves the Utility in the awkward position of having to demonstrate "necessity" without really being able to show "necessity" until it has secured the required approvals of the agencies. On the other hand, as the nuclear-powered facilities approach completion, the need for a cooling system becomes urgent. It would be unreasonable to allow canal construction to begin only after all permissions have been granted since this would needlessly postpone the benefits of the completed facilities, which would stand idle and untested until completion of the canal. A rational balance must be struck between protection of the public interest in our natural resources under Article II, Section 7, Florida Constitution, and the completion of public works which are also in the public interest.
This balance is struck through our decision today. By requiring that the Utility, as a condemning authority, reasonably demonstrate that the regulations and requirements of the appropriate agencies can and will be met, the public interest is safeguarded while a rational scheme of construction and development is allowed. Further, by requiring a demonstration by the Utility that condemnation in advance of project approval will not lead to irreparable damage to natural resources should approval be denied, the public interest is again safeguarded. A reasonable demonstration by the Utility, and any condemning authority, that it can satisfy these two requirements will not be overturned unless the adverse party meets the burden of presenting "strong and convincing evidence" *215 to the contrary as required under Rott v. City of Miami, 94 So.2d 168 (Fla. 1957).
In the instant case, Seadade has contended that, if carried through, the proposed project will harm the Card Sound ecology. The contention has merit in that it cannot be denied that a disruption of the indigenous biota is inevitable when immense amounts of heated waters are constantly flushed into the Sound. But the prime ecological issue is the extent of the disruption, not whether disruption is to occur or not. See United States v. Florida Power & Light Company, 311 F. Supp. 1391 (S.D.Fla. 1970), in which the United States District Court having jurisdiction over the Sound denied a motion for a preliminary injunction to halt discharge from the Utility's present operations; the District Court recognized that some harm occurs, but held that no irreparable damage was demonstrated.[2] The local, State and Federal authorities ultimately concerned with the Utility's nuclear project are still in the process of determining the permissible temperature levels for discharge waters, but from testimony and exhibits contained in the record, it does not appear likely that the concept of water circulation and discharge itself will fall from favor.
In our view, through the proceedings below the Utility has demonstrated sufficiently that it can adjust its discharge temperatures by various means if necessary, so that even if its proposed discharge temperatures are found to be unacceptable, adjustments are possible, and compliance will be forthcoming. Seadade bases its objections to the project on the assertion that any intake-discharge system is ecologically unacceptable and therefore not in the public interest; in so doing, it has failed to overcome the Utility's demonstration that compliance is possible since the exhibits and testimony show that discharge will likely be permitted, the only issue with outside authorities being the acceptable temperature range of discharged waters. Moreover, although the Utility has not formally demonstrated that irreparable harm will not result from the excavation and flooding of the canal should no discharge be allowed, it appears from the exhibits and testimony that a sufficient showing was made that irreparable harm would not result.
As was noted earlier, the conflict giving rise to our jurisdiction stems from a clash between the District Court's holding that consent or approval of a condemning authority's project by outside authorities is not an issue in condemnation proceedings, and this Court's holding in Robertson v. Brooksville & Inverness Ry., supra, to the effect that a condemning authority cannot proceed without a right of use. We now resolve these conflicting decisions by holding that where independent governmental agencies charged with safeguarding natural resources must ultimately approve a project involving condemnation, the condemning authority must demonstrate a reasonable probability of obtaining approval, and it must also demonstrate that the condemnation will not result in irreparable harm should the approvals be denied. Cases of this nature are to be distinguished from those cases akin to Carlor Co. v. City of Miami, 62 So.2d 897 (Fla. 1953), wherein it was said:
"It is not necessary that a political subdivision of the state have money on hand, plans and specifications prepared and all other preparations necessary for immediate construction before it can determine the necessity for taking private property for a public purpose." 62 So.2d at 902.
Carlor was concerned with the progress of the condemning authority's preparations in advance of condemnation, a matter solely within the responsibility of the condemning *216 authority. Here, instead, we are concerned with condemnation powers in connection with projects having a direct effect upon our natural resources, which cannot succeed, or have any practical value, save if the proposed project receives the approval of authorities charged with safeguarding the public interest, and which are external to and independent of the condemning authority.
We find upon consideration of the exhibits and testimony adduced below that the Utility has successfully met the requirements announced in this opinion. Because the District Court in effect reached the result we have come to today, and because we concur in all other aspects of the District Court's opinion save as modified by this opinion, the writ heretofore issued in this cause must now be discharged.
It is so ordered.
ROBERTS, C.J., ADKINS and DREW (Retired), JJ., and HODGES, Circuit Judge, concur.
ERVIN, J., concurs specially with opinion.
ERVIN, Justice (specially concurring):
If Florida Power is in fact denied the required described governmental permits, signifying there are pollution or ecological hazards, and is unable to go forward with its proposed canal plan, it will own a strip of land in fee simple through the middle of Seadade's property which it cannot devote to the use originally contemplated and for which purpose only eminent domain was authorized to be brought by Florida Power. This would create a problem unnecessarily disadvantaging to condemnee and inimical to its future use of its tract of land considered as a whole. On the other hand, condemnor would own title to lands which it could not devote to the use for which it was condemned. Moreover, in any event, in order to protect the public interest, consummation of the right to excavate the canal ought to be held in abeyance in these proceedings until the described permits are secured.
This potential problem can be readily and easily avoided if this Court were to hold, as I feel it should, that the fee simple title to the condemned land taken by the condemnor is a defeasible fee unless and until the required permits are granted to condemnor. The condemned unexcavated canal land and other lands taken would then return to the condemnee if the condemning body were unable to obtain the necessary authorizations (described in the majority opinion) from pollution control agencies. In the event this were to occur, the condemnee should be required to return all the condemnation money awarded that it received from the condemnor within a short period of time, perhaps within thirty days from the date the described necessary permits were unquestionably and irrevocably denied; otherwise, title absolute in the condemned land would vest in condemnor.
This equitable method of handling should be referred to the trial judge for implementation in these condemnation proceedings, depending upon future eventualities. Cases have been decided where equity has intervened in comparable situations to relieve against the harshness and hardship of unnecessary and abortive legal results and to restore, as far as possible, the status quo ante.
We are peripherally involved here with a subject of new dimension in modern society, i.e., pollution and ecological hazards that appear to pose a very ominous threat to the public welfare. The courts should keep pace with modernity and not follow old concepts that ignore realities and equities involved in coping with this new dimension.
The object of this special opinion is not to suggest any delay in the affirmance of these proceedings for the condemnation of the subject lands for the canal use, etc., or to in anywise thwart realization of the *217 condemnor's project, but only to do equity by stipulating conditions rendering title to the condemned land defeasible in the event the project fails because required permits relating to subjects of pollution and ecological hazards are irrevocably denied.
Except as herein otherwise suggested, I agree to the conclusion reached by the majority.
CARLTON and ADKINS, JJ., concur.
DREW, Justice (Retired):
I do not disagree with the observations of Justice ERVIN in the special concurring opinion but I find no authority in the courts to do what is suggested. There are many facets to the problem which should be considered and resolved by the Legislature  not the courts.
NOTES
[1] City of Miami Beach v. Manilow, 232 So.2d 759 (3rd D.C.A.Fla. 1970) is not relevant to jurisdiction, but only to the merits of this case.
[2] Judgment on the question of discharge from the nuclear facilities was withheld pending further presentation of evidence. Similarly, nothing we say today is to reflect judgment on the issues which may be raised regarding the proposed discharge; our decision is limited to the propriety of the condemnation proceedings.