**SILVER DOLLAR METROPOLITAN DISTRICT, Petitioner–Appellant,**

v.

**Oliver Renard GOLTRA, Respondent– Appellee.**

**No. 01CA2298.**

Colorado Court of Appeals, Div. V.

Oct. 24, 2002.

Certiorari Denied March 24, 2003.*

---

* Justice RICE does not participate.

Justice MARTINEZ would grant as to the following issues:

Whether the court of appeals confused public use and necessity, which are subject to judicial review, with feasibility of the project, which is not.

Whether the court of appeals erred by rejecting the District's contention that the trial court abused its discretion by denying the District's motion for immediate possession.

Grimshaw & Harring, P.C., Wayne B. Schroeder, Jody Harper Alderman, Julie Karon Blakley, Denver, CO, for Petitioner–Appellant.

Faegre & Benson LLP, Leslie A. Fields, John R. Sperber, M. Patrick Wilson, Peggy P. Chiu, Denver, CO, for Respondent–Appellee.

Opinion by Judge MARQUEZ.

In this condemnation action, petitioner, Silver Dollar Metropolitan District, appeals the judgment dismissing the petition in condemnation, the order denying its motion for immediate possession of two parcels of real property, and the award of attorney fees and costs. Respondent, Oliver Renard Goltra, is the owner of record. We affirm.

The District is a metropolitan district, created in August 2000 pursuant to the Special District Act, § 32–1–101, et seq., C.R.S.2002. The District's service plan provides that the District has the power to evaluate, finance, survey, acquire, design, engineer, and construct street and street safety improvements consisting of an alternative access route from Interstate Highway 70 (I–70) to the City of Black Hawk, including alternative tunnel alignments from certain interchanges.

The District decided to pursue a tunnel project that would connect U.S. Highway 6 (U.S.6) to State Highway 119 (SH 119) at the I–70/U.S. 6 interchange. The plan includes construction of a twin bore, 4,000 foot tunnel with the stated purpose of improving safety and access to the gaming areas, particularly Black Hawk.

In connection with the tunnel project, the District contacted respondent and offered to purchase two parcels totaling 5.6 acres. Although respondent had previously allowed the District access to other portions of his property for geotechnical core drilling, he refused to sell the two parcels, and the District instituted this condemnation action. The petition stated it was necessary to acquire a fee simple interest "for construction, operation and maintenance of a roadway and tunnels." The tunnel project is one of five transportation alternatives being evaluated by agencies of the state and federal governments, and when the condemnation action was filed, no one alternative had been selected.

The trial court held a hearing on the District's request for immediate possession. The District asserted that immediate possession of the subject property was needed to conduct core drilling and obtain geotechnical information that would allow the District to complete design of the tunnel portals and other structures. According to the District, structural design plans were needed to obtain various permits and move the tunnel project forward. However, to accommodate the core drilling machinery, the District

would have to construct access roads, including temporary access over a creek, and dig into the mountainside on both parcels. The District acknowledged that the steep topography of the subject property makes it impossible to acquire the necessary geotechnical information for permits without causing substantial damage and that it would be very difficult to return the property to its preexisting condition after core drilling takes place.

Respondent contended that development of geotechnical data was not necessary to advance the project, that the District could not show that the condemnation action was for a public purpose, that the condemnation action was premature because the District had yet to obtain a number of permits and approvals, and that the District instituted the condemnation action in bad faith.

The trial court determined that the District was properly formed and had the authority to construct the tunnel project. However, the court found that the subject property was not being taken for a public use and that the District would be acting in bad faith by proceeding with the condemnation at this time:

> The District is not taking the property for a public purpose, it's being taken to do core drilling and to determine if it's possible that the property can be used for public use in the future. I find that this is not ... a taking for a public use, but a taking for exploring and competing with other projects, and I find that this is bad faith to proceed at this time, with this condemnation, when there's no better indication that the project will ever [be] accomplished. The Petitioner's request for immediate possession is denied.

> This case is ordered dismissed on the motion of Goltra.

In addition to filing a notice of appeal with this court, the District filed a petition for writ of certiorari with the supreme court. That petition was denied on August 19, 2002.

## I.

The District contends that a court may inquire whether property is necessary for the intended purpose, but a court may not inquire whether the proposed project is either feasible or practical. Thus, according to the District, the trial court erred in so inquiring and substituted its judgment for the District's legislative decision on the feasibility of the project. We do not agree that the trial court substituted its judgment regarding the feasibility of the project.

Section 32–1–1004(4), C.R.S.2002, authorizes a metropolitan district to exercise the power of eminent domain in the manner set forth in § 38–1–101, et seq., C.R.S.2002, provided, inter alia, that the taking is necessary and the purpose for the condemnation is judicially determined to be a public use. *Denver W. Metro. Dist. v. Geudner*, 786 P.2d 434 (Colo.App.1989). The District's authority to condemn is not at issue here.

The determination of necessity is an essential part of the power of eminent domain, and once necessity is determined by legislative act, no further finding or adjudication is required. The determination of necessity is not reviewable by the judiciary absent a showing of fraud or bad faith. *City of Thornton v. Farmers Reservoir & Irr. Co.*, 194 Colo. 526, 575 P.2d 382 (1978); *Colo. State Bd. of Land Comm'rs v. Dist. Court*, 163 Colo. 338, 430 P.2d 617 (1967).

The question of necessity simply involves the necessity of having the property sought to be taken for the purpose intended. Whether an enterprise is feasible or practicable, and whether it will be a financial success, cannot be questioned in determining necessity, and such questions are not for the court's determination. *See Mortensen v. Mortensen*, 135 Colo. 167, 309 P.2d 197 (1957); *Gibson v. Cann*, 28 Colo. 499, 66 P. 879 (1901).

The District points out that the trial court stated, without commenting on necessity, that "this is bad faith to proceed at this time, when there's no better indication that the project will ever [be] accomplished." The District also points to the trial court's statements that it "is unlikely that the District will get the permits for many, many years, and I think it's been established that there's some doubt that it can ever get the

permits in order to proceed to do the project." Also, the court found it "very relevant that the District has this huge batch of problems that are going to stop them for sure, for many years from doing this project, and maybe ... ever doing it."

However, as the District acknowledges, the court also observed, "[I]t's not my place to question the feasibility of the project or whether it will work ... and practicality or feasibility has not been considered by me because it's not supposed to be."

In our view, the court's comments did not relate to the feasibility of the tunnel project, but rather to whether there would ever be a project for which the property could be lawfully condemned. As discussed below, such inquiry was relevant to the issue of public use.

## II.

The District next contends that the trial court erred by imposing a burden on the District to prove, before it exercises the power of eminent domain, that (1) it "can and will" obtain permits and environmental impact statement (EIS) approval of its project to show that its project will serve a public use, and (2) immediate possession will not lead to irreparable damage to "natural resources," if permits and EIS approval are denied and the project is not completed. We conclude the trial court did not impose such burdens.

## A.

Contrary to the District's contention, the trial court did not require it to prove that it "can and will" obtain permits and EIS approval.

▪ Colorado law does not require a condemning authority to obtain development permits or approvals as a condition precedent to going forward with a condemnation proceeding. *See Pub. Serv. Co. v. Shaklee*, 784 P.2d 314 (Colo.1989)(obtaining a certificate of necessity from the Public Utilities Commission (PUC) not required); *Miller v. Pub. Serv. Co.*, 129 Colo. 513, 272 P.2d 283 (1954)(same); *see also Buck v. Dist. Court*, 199 Colo. 344, 608 P.2d 350 (1980)(approval of proposal for construction of dust levees from PUC not required).

In its order, the trial court referred to *Seadade Industries, Inc. v. Florida Power & Light Co.*, 245 So.2d 209, 214 (Fla.1971), in which the Florida Supreme Court held:

> [T]he judiciary may require, first, that the condemning authority reasonably demonstrate that the regulations and requirements of the independent authorities can and will be met; second, that condemnation and taking in advance of project approval will not result in irreparable damage to natural resources and environment, should the independent authorities decline to approve the proposed project.

While the trial court stated that the rule in *Seadade* "sounds like a sound rule for this type of case" and "seemed to fit a lot of problems ... in this case," the court also stated, "I don't really find anything to say that this is the law or the rule in Colorado." The trial court went on to discuss Colorado cases and found them most persuasive. Thus, it based its denial of the District's request for immediate possession on Colorado law and did not apply the rule of *Seadade*.

## B.

Nor did the court require the District to prove that immediate possession will not lead to irreparable damage to natural resources if permits and EIS approval are denied and the project is not completed.

Citing *Seadade, supra,* and *Mortensen, supra,* the District asserts that it need not prove that it could ever use the property if it obtained it. However, the trial court did not rely on *Seadade* in reaching its decision. Rather, the trial court based its determination on bad faith and the lack of a public use. Further, *Mortensen* pertains to the question of necessity, not public use.

More recently, the supreme court in *Public Service Co. v. Shaklee, supra,* indicated that the likelihood that a condemning authority will obtain the necessary permits and approvals may be relevant to a trial court's determination of public use:

Although obtaining a certificate of necessity is not a condition precedent to going forward with a condemnation proceeding, the likelihood that such a certificate will be issued by the PUC may be relevant to the trial court's determination of public use. If the utility is unable to obtain the required certificate, and therefore is unable to make any use of the land to be condemned, this fact may sustain the burden of the party opposing condemnation to show that the proposed use is not a public use because the utility will be precluded from making any use whatsoever of the condemned property.

*Pub. Serv. Co. v. Shaklee, supra,* 784 P.2d at 317 n. 3.

■ Whether a contemplated use is a public use is an issue for judicial determination. *Shaklee v. Dist. Court,* 636 P.2d 715 (Colo. 1981). However, no definition of public use has been formulated that is applicable in all eminent domain cases. *Pub. Serv. Co. v. Shaklee, supra; Buck v. Dist. Court, supra.*

Here, the court was relying on the language in *Public Service Co. v. Shaklee* and ruling on the question of public use when it made its observation regarding permits.

### III.

The District further contends that immediate possession is necessary to obtain geotechnical information, which in turn is necessary to complete the design. It also contends that geotechnical investigation to determine whether a public project can be constructed on a property constitutes a public use, even if the project is not thereafter constructed. Thus, it asserts that the trial court erred by concluding that core drilling for road and tunnel construction does not constitute a public use. We disagree.

■ In reviewing the condemning authority's finding that a proposed taking is for public use, the court's role is to determine whether the essential purpose of the condemnation is to obtain a public benefit. *Denver W. Metro. Dist. v. Geudner, supra.* In determining whether a use is public, the court must consider the physical conditions of the country, the needs of the community, the character of the benefit that the projected improvement may confer upon the locality, and the necessities for such improvement in the development of the resources of the state. The owners of the property to be condemned have the burden of proving that the taking is not for a public purpose. *Pub. Serv. Co. v. Shaklee, supra.*

■ Here, the needs of the community, the character of the benefit, and the necessities for the project are matters yet to be determined. As stated by the trial court, the condemnation is premature. The record indicates that the District must obtain several permits and approvals, including a 1601 permit, before it can begin actual construction on the tunnel project. A 1601 permit was described as the policy directive of the Colorado Department of Transportation (CDOT) for interchange approval that would allow an entity to tie into an existing interstate highway. Issuance of a 1601 permit requires approval by CDOT and the Federal Highway Administration (FHWA). If the District cannot obtain a 1601 permit, the tunnel project will not be built.

Before the District can complete the fourteen-step 1601 approval process, the tunnel project must be selected as a preferred alternative in the Access to the Gaming Areas EIS. As noted, at the time of the hearing, the tunnel project was one of five transportation alternatives being evaluated in the EIS.

A construction manager for the District testified that he had not received a commitment from CDOT representatives that the tunnel project would be one of the preferred alternatives. He also testified that it is possible that no use would be made of the subject property, that there would be definite damage to the property, and that the future construction of the project lies outside the control of the District.

A project manager for CDOT testified that the EIS might identify more than one preferred alternative, that there was no indication which alternative or alternatives would be selected, and that all the alternatives were under consideration. In addition, the District received a letter from the FHWA in March 2001 encouraging it to wait until the

record of decision (ROD) is published before proceeding with its final design.

Performing core drilling on the subject property will benefit the public only if the tunnel project is selected as a preferred alternative in the EIS. Therefore, the trial court correctly determined that at this time, condemning the property for core drilling is not a taking for a public use because the taking would be to determine if it is possible that the property could be used for a public use in the future and to explore and compete with other projects. Thus, the District may be precluded from making any use whatsoever of the subject property. *See Pub. Serv. Co. v. Shaklee, supra; Denver W. Metro. Dist. v. Geudner, supra.*

As the trial court noted, this position is also supported by the supreme court's statement in *Colorado & Southern Railway v. District Court,* 177 Colo. 162, 166, 493 P.2d 657, 659 (1972):

If the railroad acquires immediate possession of the property by eminent domain and the commission later determines the "particular point of crossing" to be at another location pursuant to [statute], the railroad would have acquired land or an easement that it cannot use, and the one against whom the decree was entered would have had taken from it property actually not subject to condemnation.

While no public utility is involved in the present case, no decree granting immediate possession can be entered without a designation and determination of the property involved. Further, if another transportation alternative is selected, the District would have taken property not subject to condemnation.

Accordingly, under the present circumstances, the trial court did not err in concluding that the taking was not for a public use.

## IV.

In view of our disposition, we reject the District's contention that the trial court abused its discretion by denying the District's motion for immediate possession.

Further, we do not address the District's contention that the trial court improperly determined that the condemnation action was instituted in bad faith. Although the District also seeks to have the award of costs and attorney fees set aside, it does not separately address that award. Thus, we do not address it here.

The judgment and order are affirmed.

Judge NIETO concurs.

Judge ROY dissents.

Judge ROY dissenting.

I respectfully dissent.

In my view, the trial court and the majority confuse public purpose and necessity, which are subject to judicial review, with feasibility, which is not.

The district was formed to build a public road to improve access to Black Hawk. There are very few purposes which are more public than the construction of a public road by a public entity formed for that purpose.

In this case, feasibility, that is, whether the project can be built, depends on both the engineering feasibility and the approval of several regulatory agencies. In my view, it is up to the district to determine the order in which these matters are to be addressed. There is no point in having the necessary permits if the project cannot be constructed as proposed. And, while the reciprocal is true, that is the project cannot be constructed without the necessary permits, the granting or denial of permits is subject to negotiation, compromise, and accommodation.

The trial court found, and the majority does not have to address, that the district acted in bad faith with respect to necessity. That finding was premised on the district's choice to determine the engineering feasibility of the project prior to obtaining the necessary permits. That conclusion, in my view, is incorrect as a matter of law because it confuses necessity with feasibility.

Therefore, I would reverse and remand for further proceedings.