Opinion by JUDGE HARRIS
¶ 1 Appellant, Woodcrest Homes, Inc., owned a .65-acre parcel of land (referred to as Parcel C) outside the Town of Parker. Century Communities, Inc., and its subsidiaries (collectively, the Developer) acquired the parcels to the north and south of Parcel C, with a plan to create a development-Carousel Farms-comprising all three parcels. Under its agreement with the Town, the Developer could not move forward with its development plan until it acquired Woodcrest's land.
¶ 2 Woodcrest, though, declined to sell Parcel C for the price offered. So the Developer threatened to condemn the property.
*805 When Woodcrest did not acquiesce, the Developer created the Carousel Farms Metropolitan District (District), the appellee, which promptly initiated condemnation proceedings and took possession of Parcel C.
¶ 3 The District defends the condemnation of Woodcrest's property as a lawful exercise of its power of eminent domain on the theory that Parcel C will ultimately be used for a public purpose. In accordance with the Developer's proposed development plan, the infrastructure for the Carousel Farms subdivision, including public improvements such as roads and sewers, will be located on Parcel C.
¶ 4 We conclude that the District cannot meet its burden by showing that, under the Developer's plan, once approved, the taking will result in the property's eventual use for public purposes. Rather, the taking itself must be necessary to serve a public purpose.
¶ 5 Here, the taking was carried out by the District, acting as a sort of alter ego of the Developer, to ensure that the Developer met its contractual obligations to the Town. True, once those obligations are satisfied and the development plan can proceed, the District intends to put the property to a public use. But this amounts to a classic case of the tail wagging the dog-the District condemned property to advance the private development process, the completion of which would then require the construction of infrastructure, which qualifies as a public purpose necessitating the condemnation of Parcel C. We do not agree that this scenario passes constitutional or statutory muster, and therefore we reverse.
I. Background
A. Woodcrest Begins the Development Process and Buys Parcel C
¶ 6 Carousel Farms comprises two twenty-acre parcels (Parcel A and B) and the .65-acre strip of land sandwiched between them (Parcel C), located in unincorporated Douglas County.
¶ 7 Woodcrest initially intended to develop Carousel Farms. As a prerequisite to development, the three parcels had to be annexed into the Town, rezoned as planned development, and approved as a subdivision-an extensive process that entailed the preparation and approval of a sketch plan, a preliminary plan, and a final plat. As the Town explains in its municipal code, "[e]ach step is a distinct process involving the submittal of an application, an application fee, required plans and reports, referrals of the proposal to other agencies and public hearings/meetings." Parker Mun. Code 13.07.040(a)(2).
¶ 8 To meet those obligations, Woodcrest bought Parcel C and entered into contracts to buy Parcels A and B. It executed an annexation agreement and successfully progressed through the sketch plan and preliminary plan phases of the subdivision process. The final plat prepared by Woodcrest's engineering firm was never approved, however, because Woodcrest did not ultimately acquire Parcels A and B. After six months without further progress, Woodcrest's development plans were deemed abandoned.
B. The Developer Takes Over Development of Carousel Farms
¶ 9 About five years later, in 2012, the Developer stepped in. At the immediate possession hearing, the Developer testified that it essentially picked up where Woodcrest had left off: the engineering firm had retained all the development plans so the Developer was "able to pick those plans up." It contracted to buy Parcels A and B and began the subdivision process, making some adjustments to Woodcrest's plans along the way.
¶ 10 In January 2014, the Town entered into a new annexation agreement (the Agreement) with the then-current owners of Parcels A and B. Under the terms of the Agreement, the Town would not annex Parcels A and B, nor would it approve any plats for Carousel Farms, unless the Developer owned all three parcels, including Parcel C. This latter condition was contained in the following provision:
2. Consolidation of Ownership of the Property and the Strip Parcel. The Town has no obligation to approve (including the setting of any public hearings) any plats for the Property until *806 all of the following conditions are satisfied:
a. [The Developer] or its assign is the owner of the Property [Parcels A and B] and the real property described in Exhibit C [Parcel C] ... (the "Strip Parcel").
b. The Strip Parcel [Parcel C] is zoned PD-Planned Development....
c. The Strip Parcel [Parcel C] is made subject to this Agreement by an amendment hereto.
(Formatting omitted.)
¶ 11 In the meantime, the Developer made overtures to Woodcrest to acquire Parcel C. In January 2013, it offered to buy the parcel for approximately $45,000. But Woodcrest declined that offer, noting that it had essentially subsidized the Developer's entitlement process because the Developer had used Woodcrest's development plans and because the owners of Parcels A and B had retained Woodcrest's earnest money, presumably reducing the Developer's purchase price of those parcels. Woodcrest told the Developer that its offer "must increase substantially."
¶ 12 The Developer did not make another offer. Instead, two weeks later, it sent Woodcrest a notice that it intended "to move forward with annexation into the Town of Parker." If Woodcrest did not accept the offer "expeditiously," condemnation proceedings would be initiated "with Town Council's support." The Developer did not explain the basis for its authority to condemn Woodcrest's property, and Woodcrest assumed that it was the Town that might move to condemn Parcel C.
¶ 13 In fact, though, the Town never considered condemning Woodcrest's property. At the possession hearing, the Town's representative testified that the Town did not even want to "talk about" the possibility of taking Parcel C because the Town "d[oesn't] do condemnation." Rather, as the Town's representative explained, the Town preferred that "the two property owners," meaning the Developer and Woodcrest, "work it out by themselves."
¶ 14 But the Developer made no further attempts to "work it out" with Woodcrest. Instead, it simply moved forward with its development plans. It closed on Parcels A and B and, in the fall of 2014, the former owners assigned their rights and obligations under the Agreement to the Developer.
¶ 15 On September 2, 2014, the Town held a public hearing on the Carousel Farms sketch and preliminary plan. The Town's planning department conditioned approval of the plan on the Developer acquiring and rezoning Parcel C and including it within the Agreement. According to the planning department representative, only with the addition of Parcel C would the Developer's sketch and preliminary plan satisfy the density requirements under the Parker 2035 Master Plan. The Town approved the plan on the condition that "[t]he Woodcrest Parcel shall be acquired, rezoned to Carousel Farms PD and made a part of the Carousel Farms Annexation Agreement."
C. The Developer Forms the District and the District Condemns Parcel C
¶ 16 During the fall of 2014, the Developer also created the District, a new metropolitan district that would serve Carousel Farms. According to the District's service plan, the District's primary purpose was to finance the construction of public improvements authorized to be constructed as part of an "Approved Development Plan," such as a final plat.
¶ 17 At the time the District was created, the Agreement still required "[c]onsolidation of [o]wnership of the Property [Parcels A and B] and the Strip Parcel [Parcel C]" as a condition precedent to approval of the Carousel Farms final plat. More specifically, the Town was not obligated to set a hearing on the Developer's plat until "[the Developer] or its assign, [was] the owner of the ... 'Strip Parcel.' "
¶ 18 On December 10, 2014, the District, acting through its Board of Directors, who were all employees or principals of the Developer, issued to Woodcrest a "Notice of Intent to Acquire" Parcel C. The notice explained that the District was "proceeding with the construction of certain street and related improvements" for "the Carousel *807 Farms development, which improvements are required by the Town of Parker (the 'Project')." Due to "the immediate need for this Project," the notice continued, "the District must obtain [Parcel C] promptly." The District warned that if Woodcrest rejected the offer, the District would "initiate eminent domain proceedings to acquire [Parcel C], so that it can proceed with the Project."
¶ 19 The District then approved a "Resolution of Necessity," stating that "in order to construct and install the Public Improvements for the property within and served by the District, it is necessary for the District to acquire" Parcel C. As part of the resolution, the District's Board of Directors found that
it is necessary to the public health, safety, and welfare of the property owners and residents of the District for the District to construct the Public Improvements and it is necessary for the public health, safety and welfare of the property owners and residents of the District to exercise its power of eminent domain to acquire the Property....
At the time of the resolution, the District had no residents, the only two property owners having sold their property to the Developer.[1]
¶ 20 When Woodcrest declined the offer, the District filed a petition in condemnation and request for immediate possession of Parcel C. The District's petition asserted that "there is a public need and necessity to acquire [Parcel C] ... for the construction of certain street and related improvements ... for the Carousel Farms Development...."
¶ 21 An immediate possession hearing was scheduled for March 19, 2015. The Developer's final plat had not yet been approved, but the Developer was now poised to satisfy the requirement that Parcel C be acquired and annexed into the Town as part of the proposed subdivision. But under the Agreement, the Developer-not the District-had to acquire Parcel C.
¶ 22 So, three days before the hearing, on March 16, 2015, the Developer and the Town executed an amendment to the Agreement. The amendment (though still ostensibly requiring "consolidation of ownership" of Parcels A, B, and C) made the District's ownership of Parcel C the new prerequisite to approval of a final plat. The District was not a party to the amendment; the Developer agreed to the new term.
D. The District Court's Ruling and Woodcrest's Appeal
¶ 23 At the immediate possession hearing, Woodcrest argued that the Developer was using the District to accomplish indirectly what the Developer had been unable to do directly: acquire Parcel C and thereby satisfy its obligation under the Agreement, clearing the way for the Town's approval of the Carousel Farms subdivision. The purpose of the taking, Woodcrest contended, was therefore primarily private, not public. Woodcrest urged the district court to disregard the District's statement of necessity, based on the District's bad faith in pursuing condemnation on behalf of the Developer.
¶ 24 The district court rejected Woodcrest's challenges to the condemnation petition and granted the District's request to take immediate possession of Parcel C. In arriving at that decision, the court adopted the District's proposed findings of fact and conclusions of law verbatim. It determined that condemnation of Parcel C was for a public purpose and that Woodcrest's allegations of bad faith were vague and conclusory.
¶ 25 On appeal, Woodcrest reasserts its argument that the District's condemnation of Parcel C was not necessary to advance a public purpose but instead was initiated in bad faith, for the purpose of facilitating the Developer's compliance with the Agreement.
II. Legal Principles and Standard of Review
¶ 26 Under the state constitution, a governmental entity may not invoke the power of eminent domain unless it has eminent domain power, intends to use the property *808 taken for a proper public purpose, and pays the owner just compensation for the property after giving the owner due process of law. Colo. Const. art. II, § 15. The power of condemnation has been restrained by constitutional limitations for the protection of individual property rights, and it lies dormant in the state until the General Assembly speaks. Town of Parker v. Colo. Div. of Parks & Outdoor Recreation , 860 P.2d 584, 586 (Colo. App. 1993). Thus, the authority to condemn must be conferred expressly by statute or necessarily implied from the rights, powers, and duties conferred by the General Assembly. Id. Narrow construction is the rule in determining the scope of an entity's condemnation power. Id.
¶ 27 The District is a metropolitan district, created pursuant to the Special District Act, sections 32-1-101 to - 1807, C.R.S. 2017. Under section 32-1-1004(4), C.R.S. 2017, the District may exercise the power of eminent domain.
¶ 28 Still, any taking of private property by a governmental entity must be for a public purpose. § 38-1-101(2)(b), C.R.S. 2017; see also Thompson v. Consol. Gas Utils. Corp. , 300 U.S. 55, 80, 57 S.Ct. 364, 81 L.Ed. 510 (1937) (implicit in the Fifth Amendment is a requirement that a governmental taking must be for a public, not private, purpose). There is no precise definition of public purpose; it must be determined on a case-by-case basis. Bd. of Cty. Comm'rs v. Kobobel , 176 P.3d 860, 863 (Colo. App. 2007). The relevant inquiry is whether the purpose of the condemnation is "for the public benefit." State Dep't of Highways v. Denver & Rio Grande W. R.R. Co. , 757 P.2d 181, 183 (Colo. App. 1988), aff'd , 789 P.2d 1088 (Colo. 1990).
¶ 29 The fact that private interests may benefit from the condemnation does not defeat a public purpose, so long as the "essential purpose" of the taking is to obtain a public benefit. Kobobel , 176 P.3d at 863. "Public purpose," however, does not include the taking of private property for transfer to a private entity for the purpose of economic development. § 38-1-101(1)(b)(I).
¶ 30 Whether a contemplated use is a public use is an issue for judicial determination. Silver Dollar Metro. Dist. v. Goltra , 66 P.3d 170, 174 (Colo. App. 2002). Thus, on review, "the court's role is to determine whether the essential purpose of the condemnation is to obtain a public benefit." Id. The burden of proof is on the condemning entity to establish, by a preponderance of the evidence, that the taking of private property is for a public use. § 38-1-101(2)(b).
¶ 31 The condemning entity must also establish the "necessity" of the taking-that is, that condemnation of the particular property at issue is necessary to advance the intended public purpose. Town of Silverthorne v. Lutz , 2016 COA 17, ¶ 34, 370 P.3d 368. The issues of necessity and public purpose are "closely related and, to some extent, interconnected." Denver W. Metro. Dist. v. Geudner , 786 P.2d 434, 436 (Colo. App. 1989) (quoting Thornton Dev. Auth. v. Upah , 640 F.Supp. 1071, 1076 (D. Colo. 1986) ). Ordinarily, once the condemning entity has established that the taking is for a public purpose, we will not second-guess its decision that a particular piece of property must be condemned to achieve that purpose. Absent a showing of bad faith, we will assume that the entity has selected the property necessary to carry out the purpose of the condemnation. Colo. State Bd. of Land Comm'rs v. Dist. Court , 163 Colo. 338, 342, 430 P.2d 617, 619 (1967). But if, for example, the primary purpose underlying a condemnation decision is to advance private interests, the existence of an incidental public benefit does not prevent a court from finding bad faith and invalidating a condemning entity's determination that condemnation of a particular piece of property is necessary. Geudner , 786 P.2d at 436.
¶ 32 In condemnation proceedings, we ordinarily review the district court's findings of fact for clear error and its legal conclusions de novo. Glenelk Ass'n v. Lewis , 260 P.3d 1117, 1120 (Colo. 2011). However, where, as here, the district court adopts the prevailing party's proposed findings of fact and conclusions of law verbatim, the findings are subject to "heightened scrutiny." Trask v. Nozisko , 134 P.3d 544, 549 (Colo. App. 2006). And, even under the clearly erroneous *809 standard of review, we can reverse the district court's factual findings when, although there may be some evidence to support them, we are nonetheless left, after a review of the entire record, with the definite and firm conviction that a mistake has been made. See In re Estate of Schlagel , 89 P.3d 419, 422 (Colo. App. 2003).
III. The District's Condemnation of Parcel C
¶ 33 We conclude that the District failed to demonstrate that its condemnation of Parcel C was for a public purpose and necessary for such a purpose. And, by taking Parcel C, effectively on behalf of the Developer, the District also ran afoul of section 38-1-101(1)(b)(I) -the statute prohibiting a taking for transfer to a private entity for the purpose of economic development.
A. Public Purpose
¶ 34 The District insists that the condemnation of Parcel C was for a public purpose because the property would, upon the Town's approval of the subdivision, be used for public improvements such as roads and sewers.
¶ 35 We do not doubt that the planned improvements would benefit the public or, more accurately, the future residents of the proposed subdivision. The question, though, is not whether the condemned property will eventually be devoted to a public use, but whether the taking itself was for a public purpose. See Am. Family Mut. Ins. Co. v. Am. Nat'l Prop. & Cas. Co. , 2015 COA 135, ¶ 30, 370 P.3d 319 ("[T]he Colorado Constitution requires that the taking itself be accomplished for a public purpose.").
¶ 36 At the time of the condemnation, there was no subdivision. We acknowledge that a condemning entity is not required to obtain permits and approvals as a condition precedent to moving forward with a condemnation, Goltra , 66 P.3d at 173, but the point in the development process at which the condemnation occurs is relevant to the issue of public purpose, id. And here, it is not just that the subdivision had not been approved at the time of the condemnation; it is that there could be no subdivision unless Parcel C was somehow acquired. Thus, without Parcel C, there was no likelihood of a subdivision and no necessity for the public improvements that purportedly justified the condemnation in the first place. "A condemnation action to support a public benefit that may never be initiated is premature." Kobobel , 176 P.3d at 865.
¶ 37 In other words, the taking of Parcel C was a step removed from any public purpose. A similar scenario arose in American Family Mutual Insurance Co. In that case, the state forest service initiated a prescribed burn on state property that spread unintentionally to surrounding land, resulting in significant property damage. Am. Family Mut. Ins. Co. , ¶ 2. The insurers of the property argued that the forest service had effectuated a taking of the property because the fire, at its inception, was for a public purpose. Id. at ¶¶ 29, 31. The division rejected that argument, reasoning that although the initial act of setting the fire served a public purpose, the resulting damage (or "taking") was a step removed from the original public purpose, and the initial public purpose could not support the later unintentional taking. Id. at ¶ 32.
¶ 38 Here, the essential purpose of the taking itself was to ensure that the terms and conditions of the Agreement were satisfied so that the Developer could seek approval of its final plat in the first place. Only then was approval of the subdivision even possible, and the likelihood of the need for public improvements substantial enough to justify the condemnation. See Pub. Serv. Co. of Colo. v. Shaklee , 784 P.2d 314, 317 n.3 (Colo. 1989) (Although obtaining a permit is not required before the entity can condemn property, "the likelihood that such a [permit] will be issued ... may be relevant to the trial court's determination of public use."). The later planned public use for Parcel C "does not transfer to and supply the 'public purpose' for th[e] [District's] taking." Am. Family Mut. Ins. Co. , ¶ 32.
¶ 39 When the primary purpose of a condemnation is to advance private interests, even if there will be an eventual public benefit, the condemnation is not for a public purpose. See Geudner , 786 P.2d at 436.
*810 B. Necessity and Bad Faith
¶ 40 That brings us to the closely related issue of necessity. In its briefing on appeal, the District says we must accept its assertion of necessity, no questions asked, because it issued a "Resolution of Necessity" stating that acquisition of Parcel C was necessary for construction of the public improvements and because Woodcrest failed to show (or even allege) any bad faith on the part of the District. We disagree.
¶ 41 First, having determined that the essential purpose of the condemnation was to advance the Developer's interests, we cannot simultaneously determine that the acquisition of Parcel C was necessary to accomplish a public purpose.
¶ 42 Second, the evidence of bad faith is substantial. We recognize, as the District has pointed out, that in the early stages, special district boards are generally made up of the developer's representatives. But the representatives, when serving in their capacities as board members, may not take actions based on their own self-interests as the developer. See Geudner , 786 P.2d at 436-37. At oral argument, counsel for the District conceded that the District's directors, all employees of the Developer, operated under a conflict of interest in pursuing condemnation of Parcel C. Under these circumstances, we must carefully scrutinize the District's decision to take Parcel C to ensure that it was not tainted by "bad faith." Id. at 436.
¶ 43 In our view, the evidence demonstrates that it was:
• From January 24, 2014, when it was executed, until March 16, 2015, a few days before the possession hearing, the Agreement required the Developer to acquire Parcel C, as part of a condition of "consolidated ownership" of Parcels A, B, and C.
• The Developer knew that it could not obtain approval for its final plat without acquiring Parcel C.
• When Woodcrest balked at the Developer's initial offer, the Developer did not negotiate further; instead, it threatened condemnation though it had no authority, on its own, to take Parcel C.
• In November 2014, the District was formally created. Two weeks later, the District sent Woodcrest a notice of intent to acquire Parcel C. At the time the District initiated condemnation proceedings, the Developer-not the District-was required to own Parcel C.
• On March 16, 2015, the Developer and the Town executed an amendment to the Agreement, stating that "[The District] is the owner of ... [Parcel C] (the "Strip Parcel"), to be dedicated for public use and ownership...." The District did not sign the agreement; the vice president of the Developer signed on behalf of the Developer, confirming that the District was entering into the Agreement on behalf of the Developer.
• On August 17, 2015, the Developer and the Town executed a second amendment to the Agreement, requiring both the District and Developer to submit an amended final plat to the Town showing the dedication of Parcel C for public improvements. The District did not sign this agreement either.
¶ 44 This evidence establishes that, when the Developer could not obtain Parcel C at the desired price, the District stepped in to assist the Developer and ensure that the development process could proceed. The fact that the Developer threatened to condemn Parcel C when it had no authority to do so, and then created the District (which promptly initiated condemnation proceedings), suggests a kind of alter ego relationship between the District and the Developer, as does the fact that the Developer signed the amendments to the Agreement, but the District did not. In other words, the Developer spoke for the District and the District acted for the Developer.
¶ 45 These circumstances are similar to those presented in Geudner . In that case, the property within the metropolitan district was owned by members of one family, or entities controlled by the family, and members of the family sat on the district's board of directors. 786 P.2d at 435. A family entity entered into a contract for the sale of a parcel of land *811 within the district. As a condition of the purchase, the seller required the entity to relocate a ditch on the property. Id. The family entity offered to buy property from a neighboring parcel so it could relocate the ditch there, but the owner refused. The district then instituted condemnation proceedings. Id. at 436. The trial court dismissed the petition, finding that the proceedings were initiated in bad faith. On appeal, the district argued that once it was established that relocating the ditch would yield a public benefit, the trial court was precluded from reviewing the necessity of moving the ditch to the neighbor's property. Id. A division of this court affirmed the dismissal, concluding that, while the relocation of the ditch might have provided an incidental public benefit, the essential purpose of the condemnation was to assist the family entity in completing the transaction. Id. at 436-37.
¶ 46 The District says this case is unlike Geudner because the essential purpose here is not to advance the interests of the Developer but to provide improvements to the residents of the proposed subdivision, which will benefit the public "first and foremost." But that conclusory distinction fails, for the reasons we have already explained.
¶ 47 The immediate purpose of the taking was to ensure the Developer's compliance with the contract. The District has not pointed us to a single case in any jurisdiction, and we have not uncovered one through our own research, where a court has approved a governmental entity's condemnation of private property to facilitate a private party's compliance with a contract. The government may not "take property under the mere pretext of a public purpose, when its actual purpose [is] to bestow a private benefit." Kelo v. City of New London , 545 U.S. 469, 478, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005).
C. The Prohibition on a Taking for Transfer to a Private Entity
¶ 48 In our view, the District's condemnation of Parcel C, undertaken on behalf of the Developer, also runs afoul of section 38-1-101(1)(b). That provision provides:
(b)(I) For purposes of satisfying the requirements of this section, "public use" shall not include the taking of private property for transfer to a private entity for the purpose of economic development or enhancement of tax revenue. Private property may otherwise be taken solely for the purpose of furthering a public use.
(II) By enacting subparagraph (I) of this paragraph (b), the general assembly does not intend to create a new procedural mechanism to bring about the condemnation of private property. By enacting subparagraph (I) of this paragraph (b), the general assembly intends to limit only as provided in subparagraph (I) of this paragraph (b), and not expand, the definition of "public use."
Subsection 101(1)(b) was added to the general eminent domain statute in 2006, in response to the Supreme Court's decision in Kelo . See Michael R. McCormick, Kelo Confined-Colorado Safeguards Against Condemnation for Public-Private Transportation Projects , 37 Colo. Law. 39 (Mar. 2008) ; see also Ch. 349, sec. 1, § 38-1-101(1)(b), 2006 Colo. Sess. Laws 1749-50.
¶ 49 In Kelo , the Supreme Court held that the City of New London could, consistent with the Fifth Amendment, condemn private property for the purpose of transferring it to a private nonprofit entity established to assist the city with a redevelopment project, even though there was no showing by the city that the property was blighted. 545 U.S. at 479, 125 S.Ct. 2655. Colorado, like many other states, enacted legislation in the wake of Kelo to preclude the government from taking property and transferring it to a private entity.
¶ 50 We view the District's taking as a circumvention of our anti- Kelo statute. The Agreement, as well as the Town's municipal code, required the Developer to acquire at its own cost all of the parcels for the proposed subdivision. Then, under the Agreement and the municipal code, the Developer had to make certain improvements and dedicate certain property to the Town. See Parker Mun. Code 13.07.010.
¶ 51 Woodcrest's refusal to sell prevented the Developer from meeting those obligations. The Developer, though, had no power *812 to condemn Parcel C. Nor, consistent with section 38-1-101(1)(b), could the District condemn the property and transfer it to the Developer for installation of improvements and dedication to the Town. So, instead, the District, acting as a mere conduit for the Developer, executed an amendment to the Agreement that allowed the District to acquire Parcel C and then, bypassing the Developer, simply dedicated the property directly to the Town.
¶ 52 Thus, through a manipulation of the circumstances surrounding the condemnation proceeding, the District has skirted the prohibition against a governmental entity's taking of private property for transfer to a private entity for economic development purposes. Such action violates the principle that "the law may not be used to permit one to accomplish indirectly what he may not achieve directly." Salle v. Howe , 793 P.2d 628, 631 (Colo. App. 1990).
¶ 53 The District's circumvention of the statute reinforces our view that the condemnation proceedings were undertaken in bad faith.
¶ 54 Because we conclude that the District's condemnation of Parcel C failed to comply with constitutional and statutory requirements, we must reverse the district court's judgment of possession.
IV. Expert Witness Fees
¶ 55 After the court entered its preliminary order of possession, the case proceeded to a valuation hearing to determine just compensation. Woodcrest challenges the district court's denial of its request for reimbursement of certain expert witness fees incurred in connection with the valuation hearing.
¶ 56 In light of our disposition reversing the judgment of possession, we vacate the court's order on Woodcrest's bill of costs and remand for reconsideration in accordance with section 38-1-122(1), C.R.S. 2017 (providing that a district court must award costs and attorney fees upon a finding that petitioner is not entitled to acquire real property).
V. Conclusion
¶ 57 The judgment of possession is reversed. The order on Woodcrest's bill of costs is vacated. The case is remanded to the district court for further proceedings consistent with this opinion.
Dailey and Plank* , JJ. concur

Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5 (3), and § 24-51-1105, C.R.S. 2017.

The record does not appear to include evidence of the date that Developer acquired parcels A and B. However, Woodcrest represented in its briefing that the Developer closed on the sale of the parcels between September 12 and 15, 2014, and the District did not dispute that representation.